UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


WARREN SMITH,

          Plaintiff,

vs.

R. TIFFT, et al.,

          Defendants.


                    CASE NO.:   3:12-cv-00172-RV-CJK


-------------------------


## VIDEOTAPED DEPOSITION OF WARREN SMITH


          Taken by the attorney for the Defendants
at the Okaloosa Correctional Institution, 3189 Colonel
Greg Malloy Road, Crestview, Florida, on Friday,
**January 24, 2014**, commencing at 10:15 a.m., before
Jo Ann Bryan, Court Reporter and Notary Public.


                    **ELAINE RICHBOURG**
                    **Court Reporter**
                    **2320 Brightview Place**
                    **Cantonment, FL  32533**
                    **elainerichbourg@cox.net**

2

1                          <u>APPEARANCES</u>

2

3  FOR THE PLAINTIFF:

4                  WARREN SMITH, Pro Se

5

6  FOR THE DEFENDANTS:

7                  LANCE ERIC NEFF, ESQUIRE
                   and
8                  ERIC NEIBERGER, ESQUIRE
                   Assistant Attorney General
9                  Office of the Attorney General
                   The Capitol, PL-01
10                 Tallahassee, FL  3239-1050

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           INDEX OF EXAMINATION

2                                                    PAGE

3    WARREN SMITH

4      Direct Examination by Mr. Neff              4

5    CERTIFICATE OF OATH                          104

6    CERTIFICATE OF REPORTER                      105

7    ERRATA SHEET                                 106

8

9

10

11

12           INDEX OF EXHIBITS

13                                                   PAGE

14   DEFENDANTS' EXHIBITS

15   1 - Copy of Handwritten Letter               30

16

17

18

19

20

21

22

23

24

25

4

1    WHEREUPON,

2                        **WARREN SMITH**

3    was called as a witness, and after having been duly

4    sworn, was deposed and testified as follows:

5                    **DIRECT EXAMINATION**

6    BY MR. NEFF:

7        **Q.**    Good morning.

8        **A.**    Good morning.

9        **Q.**    How are you doing?

10       **A.**    Pretty good.

11       **Q.**    All right.  My name is Lance Neff, and

12   I'm the attorney for the defendants.  We're here to do

13   your deposition on 12-cv-172.  Is that your

14   understanding?

15       **A.**    Yes, sir.

16       **Q.**    Do you understand that you need to

17   answer truthfully the questions I ask you today?

18       **A.**    Yes, sir.

19       **Q.**    If at any time you do not understand a

20   question I ask you, will you let me know?

21       **A.**    Sure.

22       **Q.**    When you answer a question, will you

23   provide a complete and full answer?

24       **A.**    Yes, sir.

25       **Q.**    If at any time during the deposition you

6

1  holidays in the middle of that, and I was
2  transitioning to another camp.  And on top of that I
3  was on protective management where they don't give you
4  a pen.  They take all of your property.  So,
5  therefore, the whole time I was unable to do
6  discovery.  Now you sit here and want me to answer
7  questions for you, but I don't have the answers
8  because you haven't in good faith given me anything.
9  You haven't sent me one document yet in regard to the
10  incidents that took place, the incidents in question.
11         Q.     Mr. Smith, the incident that you filed a
12  lawsuit on, were you present during that incident?
13         A.     Yes.
14         Q.     Do you have memory of that incident?
15         A.     No.
16         Q.     Why not?
17         A.     I have memory of some of the incident,
18  but, still, at the same time specific things -- you
19  want accurate and specific answers.  How can I give --
20  I'm a human being.  I'm not a computer.  How can I
21  give accurate and specific answers if you haven't
22  given me any of the documents to represent what's
23  going on?  You're supposed to --
24         Q.     How did you draft this, Mr. Smith?  How
25  did you draft the complaint if you don't know

7

1  anything?

2      **A.**    I drafted it because it was only a month

3  later.  It was then.  Now it's two years later.

4      **Q.**    So you're saying you have no memory of

5  this incident at all?

6      **A.**    I have memory, but at the same time --

7      **Q.**    Today -- you can give me your memory of

8  the incident today, correct?

9      **A.**    I can try my best, but at the same

10  time --

11      **Q.**    Okay.

12      **A.**    -- I want you to know that you have not

13  participated in anything.  No discovery.  I sent you

14  some interrogatories.  I sent you documents to produce

15  a document.  You have not responded to anything.  You

16  haven't -- you're trying to get these people off and

17  you're trying to do it under the surface.  You're

18  not -- good faith is out the window.  Now you want

19  good faith from me to give you my medical records.

20  You want me to do this, this, this, but you're not

21  giving me the basic things in discovery.  You didn't

22  give me no disclosure whatsoever.  You gave me

23  nothing.  And you want me to sit here and remember

24  everything.  Come on.  Play fair.  Give me what I'm

25  supposed to have and I'll give you what you're

16

```
1        A.      Yes, sir.
2        Q.      Did you draft your complaint?
3        A.      Yes, sir.
4        Q.      Did you have any help?
5        A.      No, sir.
6        Q.      Is everything in it true?
7        A.      Yes, sir.
8        Q.      Did you exaggerate anything in your
9   complaint?
10       A.      No.
11       Q.      Has anyone been assisting you in any way
12  in this case?
13       A.      No, sir.
14       Q.      Do you know what the Tips Hotline is?
15       A.      Yes, sir.
16       Q.      What is it?
17       A.      I guess if you want to jump on
18  somebody's case you call the hotline and jump on the
19  case.  I've seen it on the bulletin board in the
20  dayroom.
21       Q.      It's placed on the bulletin board?
22       A.      Yes, sir.
23       Q.      It's a hotline to the inspector
24  general's office?  You can leave a message anonymously
25  on it?
```

22

1     **A.**     Merryday.

2     **Q.**     Merryday.   That was in Orlando or Tampa?

3     **A.**     Tampa.

4     **Q.**     So who are the witnesses that saw these

5     things that happened to you?  Well, let me ask you

6     this first.  What is this case about?  It's about two

7     uses of force, two sprayings?  Is that what your case

8     is about?

9     **A.**     No.  It was -- really what happened --

10    through the time I was there there was a lot of

11    incidents, but I highlighted three incidents.

12    **Q.**     What were the constitutional violations?

13    Let me ask you that.

14    **A.**     The constitutional violations was

15    excessive use of force.

16    **Q.**     And that was on August 16, 2011 and

17    February 29, 2012?

18    **A.**     And they put me on strip in a cold cell.

19    **Q.**     That was a constitutional violation?

20    **A.**     I'm not sure.  There was no penological

21    reason for having me freeze in a cell for no -- and at

22    the same time the disciplinary report to support him

23    putting me in there.  Now, if he's so malicious and

24    sadistic with the intention to cause harm -- that was

25    to cause harm.  That's what the Chinese used to do to

26

1   what I've been through.  I've been through that.  So

2   there's no assumptions here.  That's what happened.

3   How can there be an assumption when I was in the cold

4   for four days?

5        Q.      So you're not only clairvoyant, but you

6   have dreams about things people said, too?

7        A.      No.  I have dreams and I have nightmares

8   about what happened, me being in that cell in the

9   freezing cold February 4th.  It's real cold in Florida

10  February 4th with the window locked open for no

11  reason.  They threw away the disciplinary report

12  because it couldn't hold up.  Do you understand what

13  I'm saying?  So it had to be maliciously and

14  sadistically done.

15       Q.      So we have the use of force in August of

16  2011.  We have the putting you in the cell that was

17  cold.  That was a constitutional violation.  And then

18  we have the other use of force on February 29th?

19       A.      Right, but --

20       Q.      Another constitutional violation?

21       A.      Also, we have the whole situation where

22  my grievances that I put in every time things

23  happen -- they didn't feed me.  They didn't let me out

24  for rec.  They didn't shower me.  See, these are

25  little things that I let go, but it's all connected.

35

1        A.       He said, well, you have to deal with the
2   consequences for filing grievances.  I'm not sure
3   exactly -- it was a long time ago, but that's
4   basically what he said, stop filing grievances or you
5   will have to deal with the consequences, or something
6   like that, and he walked off.  You know, the next day,
7   Cory Bevins, my roommate, got his head slammed into
8   the wall the following day after that.  It was
9   August 5th, so August 6th --
10       Q.       I'm talking about what did they do to
11  you.  I'm not really worried about what they did to
12  other inmates.  What did Mr. Kolodziej do to you?
13       A.       He seen what situation I was in.  He
14  wouldn't help.
15       Q.       What situation was that?
16       A.       They was going to gas me.  They wouldn't
17  let me out for rec, they wouldn't let me out for
18  dayroom, and they was going to spray me.  They was
19  threatening they was going to spray me.  They was
20  going to put me on strip, they was going to write me
21  up, and they was going to gas me.  So I let them know.
22  I said, I don't feel safe.  I'm in fear for my life,
23  health, and safety.  Could you have me transferred to
24  a dorm?  I was in "C" dorm.  They set me up to be in
25  "D" dorm so they could -- this thing goes back to

38

1      **A.**      -- of Lieutenant Gielow spraying me for

2   no reason.  I'm pretty sure you've seen the tape.  He

3   just sprayed me in the shower for no reason.  So he

4   seen that.  And to support that my grievances was

5   behind that saying, listen, man, this is not over.

6   They're going to keep on coming at me.  Now, he's in

7   person in front of my cell and I'm telling him, man,

8   this was going on.  These people are coming at me.

9   This time they're threatening that they're going to

10  beat me up.  You know, I need your help, man.  Just

11  transfer me to a dorm, "F" dorm, "C" dorm, any of the

12  dorms where I don't have to worry about this.

13     **Q.**     So you think you should get transferred

14  to whatever dorm you want to go to?

15     **A.**     In a situation where it's life

16  threatening or your health is threatened or something

17  like that, yes, you should be transferred to another

18  dorm where you're out of danger.  He knew I was in

19  danger in that dorm.

20     **Q.**     How did he know other than the

21  grievances and the video that he saw from the August

22  spraying?  Anything else other than the grievances and

23  the video that he saw?

24     **A.**     As head of security he sees all the

25  grievances and the time that I stopped on August 5th,

39

1    and the time that I stopped on the 23rd.  He's head of
2    security.  Even the ones that he didn't answer goes to
3    him.
4        **Q.**    How do you know that?
5        **A.**    He's responsible.
6        **Q.**    How do you know that though, that he
7    actually sees them with his eyes?  Because when you
8    send stuff to the warden they go to the warden
9    representative, right, and they respond to it, not the
10   warden himself?  That's the reason why the warden got
11   out of this case, right?
12       **A.**    I've got a question.  Is there any way I
13   can get a cup of water or use the water fountain?
14       **Q.**    One second.
15       **A.**    Thank you.
16            (Brief recess at this time.)
17   BY MR. NEFF:
18       **Q.**    Colonel Kolodziej -- other than the
19   grievances and the video, what other proof other than
20   your word in your grievances did he have that he knew
21   he should have moved you out of the dorm?
22       **A.**    He asked me to fill out several
23   inmate -- not inmate request forms.  Those forms -- he
24   had me fill out several forms, and I've got the
25   paperwork to show it at my house.

1      **Q.**      At your house?

2      **A.**      Shaner called me, the head of security.

3   He had me fill out a couple of forms.  It's not an

4   inmate request.  An inmate witness statement.  And on

5   them forms I put down everything that was going on,

6   and I was in fear for my life, health, and safety as

7   well.

8      **Q.**      Nothing different than that grievance,

9   is it?

10     **A.**      Yes, it is because he --

11     **Q.**      It's still paperwork with your word on

12  it, right?

13     **A.**      He personally requested me to do this.

14  He received it and still didn't do anything about it.

15  Basically he just said --

16     **Q.**      Did he send it to the IG's office?

17     **A.**      What do you mean?

18     **Q.**      Did he send it to the Inspector

19  General's office, your statement?

20     **A.**      I doubt it.

21     **Q.**      Did he complete a MINS report?

22     **A.**      I don't know.

23     **Q.**      You have no idea, do you?

24     **A.**      He didn't give me the paperwork.

25     **Q.**      But you don't know if he did or not, do

41

1    you?  Mr. Smith, do you know whether or not he sent it

2    to the IG's office?  Do you know at this time today

3    whether or not he sent it to the IG's office?

4         **A.**    All I know is that he requested it.

5         **Q.**    Mr. Smith, do you know whether or not

6    today as I speak to you whether he sent it to the IG's

7    office?  Do you know that?

8         **A.**    Yes.

9         **Q.**    Did he or did he not send it to the IG's

10   office?

11        **A.**    (No response).

12        **Q.**    Mr. Smith, it's a very simple question.

13   Do you know whether or not he sent it to the IG's

14   office?

15        **A.**    I don't know.

16        **Q.**    You don't know, do you, sir?

17        **A.**    I do.

18        **Q.**    What's the answer?  Did he send it or

19   did he not send it?

20        **A.**    I believe he did.

21        **Q.**    You believe he did send it?

22        **A.**    Yes.

23        **Q.**    Did he complete a MINS report?

24        **A.**    I don't know that.

25        **Q.**    Do you know what a MINS report is?

42

```
 1          A.      No.
 2          Q.      So you don't know if he completed a MINS
 3   report on your allegations, do you?
 4          A.      No, I don't know.
 5          Q.      Okay.  Is there anything else you want
 6   to tell me about Mr. Kolodziej, why he should have
 7   known that he should have moved you?
 8          A.      Yes.
 9          Q.      What's that?
10          A.      He called Shaner, Lieutenant Shaner.  He
11   had Shaner-- not only that.  After August 16th he had
12   me fill out one.  And while I was in "G" dorm, he had
13   me fill out about two or three of them, but yet he
14   still didn't move me.  He left me there.  Then when he
15   came by he told me that I should deal with the
16   consequences.  He had my roommate get beat up.  He had
17   him get special treatment, and he told them to put me
18   on strip.  There was no reason to put me on strip.
19          Q.      Did you hear him --
20          A.      Yes, yes.
21          Q.      Did you hear him say that?
22          A.      Yes.  No, no, no, no.
23          Q.      Where did this occur?
24          A.      I'm trying to figure out -- right there
25   in front of the cell, cell 15.
```

44

1    **A.**    August 16, 2011, yes.

2    **Q.**    What should the correction officers have

3    done in that situation, let you hang yourself?

4    **A.**    No.  They did what they were supposed to

5    have done.

6    **Q.**    Get you down, right?

7    **A.**    They did.

8    **Q.**    Do you think spraying you with chemical

9    agents was a deterrent to keep you from hanging

10   yourself?

11   **A.**    That's their job.  I never complained

12   about that.  They came in there.  They did the right

13   thing.  They took me down.  They took me to the

14   shower.  Everything they did they did by procedure.  I

15   have no problem with anything they did.  He wrote a DR

16   saying I was kicking and yelling on the door, but

17   there's nothing to support that.  The only reason he

18   wrote that DR is --

19   **Q.**    That was on the 16th?

20   **A.**    August 16th, right.

21   **Q.**    The 16th would be the date when the use

22   of force occurred?  When they came and got you out of

23   the cell -- they extracted you from the cell when you

24   tried to hang yourself, right?

25   **A.**    Lieutenant Gielow.  That's the first

45

1   one.

2       **Q.**     But you were written DR's for that that

3   were upheld, right?  On the 11th, August 11,

4   August 12, August 14, August 15, and August 16 you

5   were written DR's for disorderly conduct or disobeying

6   an order, right?

7       **A.**     Yes.  I already told them that that was

8   going to happen when Lieutenant Gielow got back.  The

9   guy that does that to support him coming to gas you,

10  he's smart now.

11      **Q.**     But these were upheld, right?  These

12  DR's are still on your thing?  I know, but they're

13  still upheld, right?

14      **A.**     He's a smart guy.  They go into the W-2

15  forms.  I mean, the "W" whatever they call them forms.

16  They put down -- they've got to give you DR's to

17  support them coming to gas you.  They're not going to

18  just come and gas you without any support.  So I let

19  them know that what they're going to do when

20  Lieutenant Gielow gets back is to give a lot of DR's

21  for no reason, you know, and then try to gas me.  And

22  that's exactly what happened.

23      **Q.**     But these DR's on these dates right here

24  were upheld, right?  They haven't been overturned?

25      **A.**     No, they wouldn't.

48

```
1       A.      Yes.

2       Q.      Who makes the assignments?

3       A.      No, I know his assignment.

4       Q.      I'm asking you do you know who makes the

5  assignments every day?  The officer that --

6       A.      I know there was a Lieutenant Delapp.

7  There was Lieutenant --

8       Q.      Mr. Smith, I've asked you two questions

9  and you've not answered -- my first question you have

10 not answered is on August 16, 2011 when the officers

11 came in the cell and took you down from hanging

12 yourself, did they save your life?  Yes or no.

13      A.      Yes.

14      Q.      Now, do you know who makes assignments

15 every day as to where the officers go?

16      A.      No.

17      Q.      You do not?

18      A.      No.

19      Q.      Okay.  So on whatever day you were

20 talking about when he was assigned to "F" dorm, who

21 made the assignment that day to assign him to "F"

22 dorm?  Do you know?

23      A.      He wasn't assigned to "F" dorm.

24      Q.      Okay.

25      A.      I'm telling you Lieutenant Delapp was
```

53

1    coming from my cell, that Lieutenant Gielow was lying,

2    and it was all a setup.  And he didn't mention

3    anything about me being sprayed in the shower.  That's

4    where I got sprayed at, not in the cell but in the

5    shower.

6         Q.    But the DR was upheld, right?

7         A.    Of course it's going to be upheld.

8    Ms. Fennimore, the hearing officer, she called me in

9    twice.  She dismissed it twice.  And then he wrote it

10   for a third time.  Now, he got his friend that -- she

11   wrote me a grievance -- a DR, too.  He got his friend

12   to just push it through.  She said, man, forget that,

13   I don't care, you're guilty, boom, and it was over

14   with.  There was nothing I could do about it, you

15   know.  But why would he write a DR for me causing a

16   disturbance in the shower as he so claimed.  You've

17   got the videotape.  Was I causing a disturbance in the

18   shower for him to spray me?  Did he warn me and say,

19   hey, you're causing a disturbance, settle down before

20   I spray you?  No.  But you're here trying to defend

21   this man.  You know he's wrong 100 percent.

22        Q.    Did you suffer any injury from the

23   August use of force?

24        A.    Yes.  I went to the outside hospital,

25   the eye doctor.

**54**

1       **Q.**      For what?

2       **A.**      I had -- my eye was blurry.  It was

3   messed up.  This eye now is worser (sic) than this eye

4   (Indicating).

5       **Q.**      But you didn't go blind?

6       **A.**      Oh, you've got to go blind now.

7       **Q.**      Well, that's what you said in your

8   complaint.

9       **A.**      It's hard in the Florida Department --

10      **Q.**      You said here you were blind.

11      **A.**      One thing George Bush -- a lot of people

12  don't like George Bush, the republican, but one thing

13  he said was that inmates do not get no justice in the

14  Department of Corrections.  You've got to go blind to

15  be able to seek relief here and be sprayed with some

16  chemicals with a can this big (Indicating).

17      **Q.**      So, Mr. Smith, you said --

18      **A.**      This can here --

19              THE COURT REPORTER:  One at a time,

20      please.

21      **A.**      Instead of taking a can off his waist

22  and spraying me with a little can, he come and sprayed

23  with this big can like this (Indicating) that burns

24  your skin and blisters come all over yourself for no

25  reason, but yet I've got to be blind to seek relief.

55

BY MR. NEFF:

Q.     On document 23, page 7, paragraph 10 you said, "As a result of the attack, plaintiff lost most of his eyesight in the left eye."  Is that true or not true?

A.     For a minute, not -- it came back for a while.

Q.     That's not what you say.  You just say you lost most of it.  That's where it ends.  So are you being truthful here or are you being less than truthful?

A.     I'm being very truthful.

Q.     You're being less than truthful.

A.     Very truthful.

Q.     You're trying to say you lost your eyesight.  You --

A.     There was not in the middle -- there was not a middle thing that asked me, oh, how long did you lose it and things like that.  I said at that moment I lost my eyesight.

Q.     So you just exaggerated a little bit. I'll just say that I lost my eyesight, but I won't tell them it came back.

A.     Not at all.

Q.     But it came back?

56

1       **A.**     Why?  Why?  I was never asked that so I

2   went on with what was going on.

3       **Q.**     So you're not going to give the complete

4   truth unless you're asked in a very specific way?

5       **A.**     I'm going to always give you the

6   complete truth.

7       **Q.**     Well, that's not the complete truth.

8       **A.**     That is the complete truth.

9       **Q.**     I'll read it again.

10      **A.**     You're talking --

11      **Q.**     "As a result of the attack, the

12  plaintiff lost most of his eyesight in his left eye

13  and was sent to an outside hospital."

14      **A.**     Right.

15      **Q.**     Yet your eyesight came back later on?

16      **A.**     Dude, I believe -- even if you keep

17  riding, I put down there that most of my eyesight did

18  come back, man.  I'm not trying to overexaggerate.  It

19  is what it is and the record is going to show it.  I

20  don't got to overexaggerate nothing.  What do I got to

21  overexaggerate anything for?  I don't got to

22  overexaggerate nothing.  What happened happened.

23      **Q.**     I know when you look at me both eyes are

24  looking directly at me.  So you're looking at me,

25  right?

57

1    **A.**     Dude, I don't even know why you're doing
2    a deposition.  All you've got to do is take the video,
3    show the judge -- take both the videos to show the
4    judge and come back at me and let the judge figure it
5    out.  It's not a big thing.  I'm not trying to get
6    over -- I did what I had to do.  I used my pen.  I did
7    grievances.  The only thing I didn't do -- I contacted
8    the only people I could contact.  This is what
9    happened.  This is what it is.  I'm not trying to get
10   over on nothing.
11       **Q.**     Okay.  And you also said that you didn't
12   suffer any injury from the August 2011 use of force.
13       **A.**     No.  When they came in my cell, they did
14   it professionally.  They didn't beat me up or none of
15   that.  They were professional about it.  They got me
16   down and put me in the shower.
17       **Q.**     They put you in the shower, and then
18   afterwards -- did you go see medical after the shower?
19       **A.**     Well, after he sprayed me for no reason.
20       **Q.**     And then you went to see medical?
21       **A.**     Yes.
22       **Q.**     And then you saw mental health staff
23   after that?
24       **A.**     Well, I seen him just before he sprayed
25   me.  The guy came and I was explaining to the guy that

1    way out.  He'd keep coming after me for filing

2    grievances.  I was just talking like that.

3         **Q.**      And then he sprayed you?

4         **A.**      And he just sprayed me (Indicating).  He

5    never said -- he never gave warning or nothing like

6    that.

7         **Q.**      And that's while you were in the shower?

8    When did he spray you?  Where were you at?

9         **A.**      In the shower.

10        **Q.**      You were in the shower?

11        **A.**      Yes.

12        **Q.**      Okay.  I just wanted to know where that

13   was going on.  Okay.

14               Now, during this timeframe between 8/11

15   and 8/16 of 2011 when you were put on strip -- were

16   you put on for mental health reasons or were you put

17   on for disciplinary reasons?

18        **A.**      They said disciplinary.  They said I

19   tried to flood my cell.

20        **Q.**      You had never said that you were going

21   to kill yourself and they took all your property away

22   because they didn't want you to have anything to make

23   a noose or anything with?

24        **A.**      No.  They said because I flooded my cell

25   they gave me a DR.  They said because I flooded my

63

1          Now, the mentally challenged inmates,
2    they're bored.  So what they do is they just spray
3    them anyway because they know these mentally
4    challenged inmates are not going to write them up
5    anyway.
6          So those two things right there -- those
7    are the people they're after.  I'm not the only one
8    that was going through this.  I might be the only one
9    that filed for a 1983 civil complaint.
10         **Q.**    But you've never done anything wrong in
11   order to get sprayed?
12         **A.**    No.
13         **Q.**    You've never been disorderly?
14         **A.**    No.
15         **Q.**    You've never disobeyed an order?
16         **A.**    I try to hide.  I try to hide.  The
17   only -- but I can't stand when I'm in a cell and I see
18   them gasing somebody, and they talk about stop your
19   disruptive behavior and that guy is not doing
20   anything.  I can't take it.  I've got to write it up.
21   You know, I'm right here.  This guy is not doing
22   nothing.  You're ready to spray this guy for no
23   reason.  You know, I write it up and that brings him
24   to me.
25         **Q.**    How long were you in the cell in, I

64

```
1    guess, February of 2012 when you said you were cold?
2    How long did that last?
3         A.    Four days.  The 4th through the 8th.
4         Q.    The 4th through the 8th?
5         A.    Yes.
6         Q.    Do you know what the temperature was?
7         A.    My next door neighbor said it was below
8    30.
9         Q.    But you don't know how cold it was?
10        A.    No.  They took my radio.  I know it was
11   cold.
12        Q.    Did you have any clothes?
13        A.    No.  I had a pair of boxers.
14        Q.    And you were on strip status?
15        A.    Yes.
16        Q.    Why were you on strip status?  What was
17   the reason?
18        A.    He said because I wouldn't straighten my
19   room.  I wouldn't clean my room.  He wrote a DR and
20   said I wouldn't clean my room at 7:00 in the evening.
21   But, like I said, the DR was thrown out because it was
22   conclusively refuted by the camera.
23        Q.    How do you know it was conclusively
24   refuted by the camera?
25        A.    Because I asked for the camera as
```

67

1    there's been times I didn't get trays and they did the

2    same old thing, bucked me on shower, bucked me on rec,

3    and things like that, until the time came when they

4    put me on strip and subsequently --

5         Q.     They bumped you on shower or --

6         A.     Bucked.

7         Q.     Bucked?

8         A.     Right.

9         Q.     What does that mean?

10        A.     Did not allow me to shower.  That's

11   slang here.

12        Q.     Now, on February 29th, 2012 did you hang

13   yourself?

14        A.     Yes.

15        Q.     Again, did you think the correctional

16   officer should have let you die?

17        A.     Well, I would rather them let me die

18   than what they did to me.

19        Q.     What did they do to you?

20        A.     I know -- he came and said, okay, get

21   ready, I'm going to spray you.  I said I'm going to

22   hang myself, and I put it around my neck and hung

23   myself.  They sprayed me (Indicating).  I passed out.

24   When I woke up I was in shackles and handcuffs.  I

25   mean, they was beating the daylights out of me.  I've

70

1      **A.**      Well, once I woke up because Officer
2  Hall jumped in the air and landed a knee on my face,
3  and I heard Shaner whisper, man, what are you doing?
4  You're going to kill him.  So that's when things
5  started focusing.
6      **Q.**      Why would they care if they killed you
7  or not?
8      **A.**      Why wouldn't they?  They would be
9  scrutinized.  That would be news, I get killed.  You
10  know what I mean?  Maybe you're right.  They wouldn't
11  care.  I don't know.
12      **Q.**      Well, you said they were trying to kill
13  you anyway, right?  There was a campaign of terror
14  going on.
15      **A.**      I never said they was trying to kill me.
16  It was terror.  They was trying to hurt me to the
17  point where I wouldn't file a grievance.  That's the
18  whole point, to keep that pressure on me so I won't
19  file a grievance.
20      **Q.**      Do you think the officers care if you
21  file a grievance?
22      **A.**      Yes.
23      **Q.**      Why would they care?
24      **A.**      Because the administration would get on
25  them, you know, most of them.  You know, I don't know.

71

1   That place is so crooked that I really don't know.  I

2   really don't know.

3        **Q.**     You think they would be scrutinized by

4   the administration?

5        **A.**     I believe so.  There's some people that

6   do the right thing.  Like Assistant Warden Haas is

7   pretty decent.  There's a few people that want to do

8   the right thing, but . . .

9        **Q.**     So what were your injuries from this

10  August -- I'm sorry -- this February use of force?

11  You said you had a severely swollen face?

12       **A.**     Yes, I was swole (sic) up.

13       **Q.**     Okay.

14       **A.**     My knee was swollen.  I don't know how

15  my back -- my spine felt like it -- and it still do.

16  I have huge migraines.  I know I would rub a part of

17  my arm and it would get numb.  I don't know what the

18  heck that was.  I forget everything.

19       **Q.**     So they did stop you from hanging

20  yourself on the 29th, right?

21       **A.**     Oh, yes, they did that.

22       **Q.**     So they did, in fact, save your life?

23       **A.**     Yes.

24       **Q.**     Were chemical agents used on the 29th?

25       **A.**     Yes, sir.

1  up at all.  What I'm saying is that these officers

2  used excessive force and torture tactics.

3          **Q.**      So you're saying the nurses did their

4  job?  You have no beef with --

5          **A.**      No.  No, they didn't do their job.  She

6  undermined everything that happened.  Like when I told

7  her that I've got problems with my spine and my eye

8  was messed up, they didn't take me to do no testing or

9  nothing.  I was supposed to have got an MRI on my leg.

10  They didn't do anything for me.  She said you'll be

11  all right, you know, because they people -- they both

12  live in a trailer together.  So the nurses and the

13  officers they all live together.  They are all family.

14  So she's not going to give me the opportunity to use

15  the medical against them, you know.

16          **Q.**      From May 2011 to February of 2012 were

17  you on close management at all?

18          **A.**      May 2011 to February 2012, yes.

19          **Q.**      You were on close management?

20          **A.**      I was in CM.

21          **Q.**      CM.  Which, one, two, or three?

22          **A.**      I believe 2011 -- I was in three.

23          **Q.**      Why do inmates go to CM?

24          **A.**      Well, excessive -- I went to CM for

25  excessive DRs.  I'm going to tell you that the

79

1   me it had some effect where I had blisters.  I've

2   never been sprayed by no stuff like that.

3        Q.      Did you use soap?  Were you using soap?

4        A.      No.  I was on strip.

5        Q.      Were you taking a cold water shower?

6        A.      Yes.

7        Q.      Do you have any idea how Colonel

8   Kolodziej knew about grievances that you were filing?

9        A.      He didn't know about any grievances I

10  was filing.  What did he know?

11       Q.      He didn't know about it?

12       A.      About what?

13       Q.      Grievances that you were filing.

14       A.      What grievances?

15       Q.      The ones from -- the time frame of this

16  suit.

17       A.      Like I said, he didn't know me.  I mean,

18  he didn't know what happened February 29th unless he

19  heard it from the grapevine.  So he was gone.  He

20  wasn't in the dorm.

21       Q.      Colonel Kolodziej?

22       A.      Oh, you're talking about Colonel -- oh,

23  okay.  Ask that question, again.  I'm sorry.

24       Q.      I said how did he know about the

25  grievances you were filing?  Mr. Kolodziej, how did he

80

1   know about --
2         **A.**      Oh, he signed the signature.  The
3   grievance has got his signature on it.
4         **Q.**      How many of those have his signature on
5   them?
6         **A.**      Three, I believe.  Some of them has got
7   his assistant's signature.
8         **Q.**      Do you know if he saw the ones that his
9   assistant signed off on?
10        **A.**      I'm sure he did.
11        **Q.**      Do you know that he did?
12        **A.**      If he didn't see that, he seen the
13  witness statements he asked me to put in.  He seen the
14  videotape because it's his duty to view the videotape.
15  It was his duty as head of security to review those
16  tapes.
17        **Q.**      How do you know that?
18        **A.**      Well, I put it in my grievance just to
19  make sure it's a part of the record.  And he put down
20  there that he reviewed the tape and I was being
21  disruptive.
22        **Q.**      So he did look into it?
23        **A.**      Well, he looked at the tape, and he went
24  to support Lieutenant Gielow.  Instead a dorm of
25  reprimand -- instead of reprimanding his lieutenant,

81

1  he supported him for what he did.

2        **Q.**     After reviewing the tape?

3        **A.**     After reviewing the tape.

4        **Q.**     You say on the February -- in your

5  complaint you talk about Lieutenant Shaner leaving and

6  coming back with a handheld audio camera to stage the

7  attack.

8        **A.**     Right.

9        **Q.**     Why would he stage the attack on film?

10        **A.**     Not stage the attack, no.  You've got it

11  wrong.  He came back to spray me.

12        **Q.**     That's what it says in your complaint.

13        **A.**     Can you read it out?

14        **Q.**     It says at -- document 23, page 9,

15  paragraph 18.  "Lieutenant Shaner left and returned to

16  plaintiff's cell with a handheld audio camera to begin

17  staging his attack."

18        **A.**     Where is this at?

19        **Q.**     Paragraph 18, document 23, page 9.

20        **A.**     You're not reading everything.  "On

21  February 29, 2012 shortly after lunch Lieutenant

22  Shaner returned to plaintiff's cell and stated 'There

23  is no psych nurse to save you today, Smith, so get

24  ready.  If you let me gas you twice in the face, I

25  will let you keep your property, but if you don't,

91

1    **Q.**    Is Captain Smith a good dude?

2    **A.**    He has -- I consider him a very good

3    dude pulling people off of me like that.  I'll tell

4    you, I would marry the dude.  What can I say, man?  I

5    did everything I was supposed to do.  I'm in a

6    situation where this is what happened.  You know it

7    happened.  The video shows it happened.  Imagine going

8    to court and a jury trial and showing them that video.

9    It's no way around the situation.  The only way around

10   it is to lose the video and lose the -- I don't know.

11   They showed a straight pattern of them harassing,

12   spraying me, and beating me for no reason.  Why would

13   you put me in a cell in the freezing cold?  That would

14   hurt the most.  You put me in that cell in that

15   freezing cold for four days.  Can you imagine that?

16   It's freezing and you are in your boxers.  It's

17   nothing but steel and cement.  I usually try to climb

18   up under the bunk and get up on the wall, but there

19   ain't no blanket or nothing.  So the water -- the

20   coldness of the water on a stone floor -- it's the

21   same thing.  The only thing I could do was squats and

22   pushups and keep trying to keep my body temperature,

23   you know, up.

24   **Q.**    Did the chaplain come around during that

25   time?

92

1      **A.**      I don't know.

2      **Q.**      Did a nurse come around during that

3  time?

4      **A.**      The nurse come around every day.

5      **Q.**      Did you ask for a mental health

6  emergency or a medical emergency?

7      **A.**      I asked -- the psych doctor pulled me

8  out.  They pulled me out and they talked to me and

9  they talked to the lieutenant and they put me off

10  strip.  I figured if I didn't call hurt I probably

11  would have been on strip for a week or more than that.

12  I know people that was on strip for two weeks, but it

13  was during the summertime, you know.

14      **Q.**      But never during the wintertime?

15      **A.**      I'm pretty sure.  That's their thing.

16  During the wintertime, if you check the records --

17  what I was going to bring up, too, in trial, if you

18  check the records and differentiate from summer to

19  winter every -- it's a big list during the wintertime

20  when they put you on strip.  Their whole thing --

21  Lieutenant Gielow told me one day -- he said, man,

22  I've got the job.  I believe it's justice that I got

23  the job because y'all should pay for what y'all have

24  done out there in society.  And he's the man to make

25  y'all pay.  His records show that.  Did you look at