UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WARREN SMITH,

      Plaintiff,

v.                                     Case No: 3:12cv172/RV/CJK

R. TIFFT, et al.,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case, brought under 42 U.S.C. § 1983, is before the court upon defendants Wallace, Pugh, McMackin, Hall, Shaner, Gielow, Kolodziej and Barnes' renewed motion for summary judgment (doc. 134) and evidentiary materials (docs. 109, 113). Plaintiff has responded in opposition (doc. 153), with evidentiary materials (doc. 154). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). After careful consideration, the undersigned concludes that defendants' motion should be granted in part and denied in part.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, a Florida prisoner, initiated this lawsuit on April 8, 2012, by filing a civil rights complaint under 42 U.S.C. § 1983, (doc. 1), which he later amended (doc. 23). Plaintiff's amended complaint names as defendants ten prison officials at Santa

Rosa Correctional Institution ("Santa Rosa CI"):   Warden R. Tifft, Major J. Kolodziej, Lieutenant Gielow, Lieutenant Shaner, Sergeant McMackin, Officer Hall, Officer Wallace, Officer Pugh, Officer Martelliano and Officer Barnes. (Doc. 23, pp. 1-3).  Plaintiff claims defendants Gielow, Shaner, McMackin, Barnes, Hall, Wallace, Pugh and Martelliano violated his rights under the First and Eighth Amendments from August of 2011 through February of 2012, by "participating in a terror campaign against plaintiff, as a reaction to him filing grievances."  (Doc. 23, p. 11).  Plaintiff claims defendants Kolodziej and Tifft violated his rights under the Eighth Amendment because they were aware of, and defendant Kolodziej participated in, the "terror campaign."  (*Id.*).   As relief, plaintiff seeks compensatory and punitive damages, as well as any additional relief the court deems just.  (*Id.*).

On October 31, 2013, the court granted in part defendants' motion to dismiss (docs. 66, 78), and dismissed the following claims:  (1) plaintiff's official capacity claims for damages, (2) plaintiff's individual capacity claims against defendant Martelliano and (3) plaintiff's individual capacity claim against defendant Tifft. (Doc. 87).   The case has proceeded on plaintiff's remaining claims, which are plaintiff's individual capacity claims for damages against defendants Kolodziej, Gielow, Shaner, McMackin, Hall, Wallace, Pugh and Barnes for their alleged violation of plaintiff's First and Eighth Amendment rights.  (*Id.*).

On February 18, 2014, after the close of discovery, defendants moved for summary judgment. (Doc. 109).  Volunteer counsel appeared on plaintiff's behalf on March 31, 2014. (Docs. 127, 128).  The court reopened discovery, provided plaintiff an opportunity to amend his complaint with the benefit of counsel, and denied without prejudice defendants' motion for summary judgment. (Doc. 133).  Plaintiff

did not amend his complaint.  During the reopened discovery period, defendants renewed their motion for summary judgment on the following bases:

> (1)    Plaintiff fails to establish an Eighth Amendment violation for excessive use of force or failure to intervene.
>
> (2)    Plaintiff fails to state a valid conditions-of-confinement claim against Officer Barnes.
>
> (3)    Plaintiff fails to state a supervisor liability claim against defendant Kolodziej.
>
> (4)    Plaintiff fails to show retaliation.
>
> (5)    Plaintiff fails to state an adequate physical injury to overcome the bar on compensatory and punitive damages under 42 U.S.C. § 1997e(e).

(Docs. 134, 109, 113).  Plaintiff continued with discovery and, after discovery closed, responded in opposition to summary judgment.  (Docs. 153, 154).

## FACTS

The following facts are drawn from plaintiff's verified amended complaint (doc. 23) and the evidence in the summary judgment record (docs. 109, 113, 154). *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint and repeated in a separate affidavit must be considered in opposition to summary judgment).  The facts are viewed in the light depicted by the video evidence to the extent those facts are captured on camera. *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) (holding that when uncontroverted video evidence is available, the court should "view[ ] the facts in the light depicted by the videotape").  Facts not captured on camera are viewed in the light most favorable to plaintiff. *Id*; *see also Mathis v. Adams*, — F. App'x —, 2014 WL 4067751, at *1-*2 (11th Cir. Aug. 19, 2014)

(holding that district court did not err in declining to credit those allegations of prisoner blatantly contradicted by video evidence, but district court did err insofar as it credited defendants' version of facts over prisoner's on issues not depicted by video evidence); *Stallworth v. Tyson*, — F. App'x —, 2014 WL 4215438 (11th Cir. Aug. 27, 2014) (holding that district court erred in crediting defendants' version of facts over prisoner's on issues not depicted by video evidence).

Plaintiff is a close management inmate of the Florida Department of Corrections ("DOC"). On May 11, 2011, plaintiff was transferred to Santa Rosa CI from Charlotte Correctional Institution, after the latter institution closed its close management department. (Doc. 23, p. 6 ¶ 2; Doc. 154, Ex. A, Smith Decl. ¶ 2). Plaintiff had previously been confined at Santa Rosa CI the year before, and during that time had filed grievances against defendant Gielow and was targeted for and threatened with abusive treatment by defendant Gielow. (Doc. 23, p. 6 ¶ 1; Doc. 154, Ex. A, Smith Decl. ¶ 2). The day plaintiff returned to Sant Rosa CI in 2011, Officer Edwards, a non-party subordinate of defendant Gielow, told plaintiff, "We didn't forget you, monkey. Now before we're done torturing you, you're gonna wish you were dead." (Doc. 154, Ex. A, Smith Decl. ¶ 3). Defendant Gielow was not present when plaintiff returned to Santa Rosa CI, as he was in off-site training elsewhere. (Doc. 23, p. 6 ¶ 3).

On July 28, 2011, plaintiff was moved to B-dormitory, a dormitory under defendant Gielow's supervision. (Doc. 154, Ex. A, Smith Decl. ¶ 4). Plaintiff states he was told by unidentified correctional officers that upon Gielow's return from training, he (Gielow) would make plaintiff's life " Hell", and that plaintiff would "be placed on strip, gassed and issued numerous disciplinary reports." (*Id.*; *see also* Doc. 23, p. 6 ¶ 3).

Between August of 2011 and March of 2012, plaintiff submitted grievances to a number of prison officials at various levels of the DOC asserting that he was being threatened, harassed and "tortured" by Santa Rosa CI staff, that he feared for his life and safety, and that he would kill himself if the "torture" continued.  (Doc. 154, Ex. C).  Several of plaintiff's grievances were referred to the Office of the Inspector General of Florida ("OIG") for review.  (Doc. 109, Ex. H).  Defendants Maj. Kolodziej and Lt. Shaner were among those who referred plaintiff's allegations to the OIG.  (*Id*.). All of the cases were closed with either a finding that plaintiff's allegations were unsubstantiated, that plaintiff refused to cooperate, or that there was a lack of investigative leads.  (Doc. 109, Ex. H).

On or about August 5, 2011, plaintiff stopped defendant Major Kolodziej as he was doing his rounds, and described the threats he was receiving.  (Doc. 154, Ex. D, Smith Dep. at 34-39; Doc. 154, Ex. A, Smith Decl. ¶ 6).  Plaintiff told defendant Kolodziej that he was being threatened with denial of recreation, issuance of false disciplinary reports, gratuitous placement on strip cell, denial of food and gratuitous use of chemical agents.  (*Id*.).  Defendant Kolodziej responded to plaintiff that he should "stop writing grievances or deal with the consequences."  (Doc. 23, p. 6 ¶ 3; Doc. 154, Ex. A, Smith Decl. ¶ 6; Doc. 154, Ex. D, Smith Dep. at 34-35).

Defendant Gielow returned from training on August 11, 2011.  (Doc. 23, p. 6 ¶ 4).  Upon his return, defendant Gielow told plaintiff he would make sure plaintiff was denied recreation, showers and food, given false disciplinary reports, "gassed"[1] on a regular basis, and placed on "strip cell" (property restriction whereby a prisoner is deprived of everything but a pair of boxer shorts and shower slides).  (Doc. 154,

---

1  "Gassing" is plaintiff's term for administration of pepper spray, as will be further explained below.

Ex. A, Smith Decl. ¶ 5).  That same day, plaintiff was placed on "strip cell" as a result of a disciplinary report (DR) charging plaintiff with attempting to flood his cell. (Doc. 23, p. 6 ¶ 4; *see also* Doc. 154, Ex. D, Smith Dep. at 59:14-25 - 60:1-3).[2] Plaintiff received almost daily disciplinary reports between August 11, 2011, and August 16, 2011:

- On August 11, 2011, while plaintiff was housed in B-Dormitory, Correctional Officer Jacobus issued plaintiff a disciplinary report for Disorderly Conduct (Log #119-1111932), alleging plaintiff attempted to flood his cell.  (Doc. 109, Ex. J at 1).  Plaintiff was convicted of the DR after receiving written notice, presenting evidence at the hearing, and receiving a written statement from the DR hearing team of the evidence they relied on and the reasons for the disciplinary action. Plaintiff was sentenced to 30 days in disciplinary confinement.  (*Id*.; *see also* Doc. 109, Ex. N at 2).

- On August 12, 2011, while plaintiff was housed in B-Dormitory, defendant Gielow issued plaintiff a disciplinary report for Disorderly Conduct (Log #119-111829), alleging plaintiff was yelling into the wing.  (Doc. 109, Ex. J at 3).  Plaintiff was convicted of the DR pursuant to his guilty plea, and sentenced to 30 days in disciplinary confinement. (*Id*. at 2; *see also* Doc. 109, Ex. N at 2).

- On August 14, 2011, while plaintiff was housed in B-Dormitory, Correctional Officer J. Nowling issued plaintiff a disciplinary report for Disrespect to Officials (Log #119-111843), alleging that when Nowling approached plaintiff's cell to return his property after plaintiff's property restriction was lifted, plaintiff refused to submit to hand restraints and stated, "I ain't taking nothing from a f*ck *ss cracker!  I'm gonna get ya'll fired for keeping me on strip!" (Doc. 109, Ex. J at 5).  Plaintiff was convicted of the DR pursuant to his guilty plea, and sentenced to 30

---

2  When citing to plaintiff's deposition, the number before the colon is the page cited and the number after the colon is the line cited.

days in disciplinary confinement.  (*Id*. at 4; *see also* Doc. 109, Ex. N at 2).

•      On August 15, 2011, while plaintiff was housed in B-Dormitory, Correctional Officer J. G. Davis issued plaintiff a disciplinary report for Disobeying an Order (Log #119-111844), alleging that plaintiff refused Davis' order to allow the removal of his waist chain and hand restraints so he could be restrained behind his back.  (Doc. 109, Ex. J at 7).  Plaintiff was convicted of the DR pursuant to his guilty plea, and sentenced to 30 days in disciplinary confinement.  (*Id*. at 6; *see also* Doc. 109, Ex. N at 2).

•      On August 16, 2011, defendant Gielow issued plaintiff a disciplinary report for Participating in a Disturbance (Log #119-112229, which was rewritten from a prior Disciplinary Log #119-111860 "due to technical error").  The re-written DR alleged that at 11:23 a.m., Gielow observed plaintiff yelling obscenities at staff and kicking on his cell door.  (Doc. 109, Ex. J at 8).  Plaintiff was convicted of the DR after receiving written notice, presenting evidence at the hearing, and receiving a written statement from the DR hearing team of the evidence they relied on and the reasons for the disciplinary action.  Plaintiff was sentenced to 30 days in disciplinary confinement.  (*Id*.; *see also* Doc. 109, Ex. N at 2).

## August 16, 2011 Use of Force

On August 15, 2011, defendant Gielow told plaintiff he was going to "gas" him.  (Doc. 154, Ex. A, Smith Decl. ¶ 9).  In response, plaintiff declared a psychological emergency and informed the "psych nurse" that he would kill himself if he was not relocated to another dormitory.  (*Id*.; *see also* Doc. 23, p. 7).  Plaintiff was moved to F-dormitory.  (*Id*.).

The next day, August 16, 2011, defendant Gielow came to F-dormitory and said to plaintiff, "Time for your spanking, Smith.  I can't leave my problem in this dorm to start writing grievances again.  I'll be back with the camera soon so get

ready.  Honestly Smith, I like you but you done really pissed the Colonel and Major off with your grievances.  Gotta follow orders." (Doc. 154, Ex. A, Smith Decl. ¶ 10). At 11:30 a.m., defendant Gielow contacted Duty Warden Colonel James Peters, informed Peters that plaintiff was creating a disturbance by yelling obscenities and kicking his cell door, and obtained Peters' authorization to use pepper spray if necessary to quell the disturbance.  (Doc. 109, Ex. D at 12).

The video evidence depicts defendant Gielow and Sergeant Daniel Larson (a non-party) standing in front of the camera at 11:33 a.m. on August 16, 2011. Defendant Gielow announces that plaintiff was yelling and kicking on his cell door. Sergeant Larson states that plaintiff was yelling into the wing and kicking on his cell door; that Larson counseled plaintiff to cease his disruptive behavior and gave plaintiff numerous orders to cease; and that plaintiff refused to comply with all orders. (Doc. 109, Ex. A at 0:00:37 - 0:00:58).[3]  Defendant Gielow states that he, too, counseled plaintiff to cease his disruptive behavior and that plaintiff refused.  (Ex. A at 0:00:59 - 0:01:10).   Defendant Gielow and Sgt. Larson proceed through the dormitory to plaintiff's cell door.  As they proceed, no yelling is audible.  (Ex. A at 0:01:16 - 0:01:40).   Defendant Gielow arrives at plaintiff's cell door and plaintiff appears at the window.  (Ex. A at 0:01:40).   Defendant Gielow informs plaintiff that he is giving plaintiff a final order to cease his disruptive behavior and that if plaintiff fails to do so chemical agents will be administered.  (Ex. A at 0:01:40 - 0:01:46). Plaintiff responds that he told defendant Gielow he "would kill himself in this camp." (Ex. A at 0:01:50 - 0:02:00).  Defendant Gielow and Sgt. Larson walk from plaintiff's

_____

3 Defendants' Exhibit A is a digital video disk (DVD) with audio, filed under seal, which captures part of the events occurring on August 16, 2011.  The times referenced are the hand-held video's runtime noted in the upper right hand corner of the video.

cell door to the camera, at which time plaintiff repeatedly declares a psychological emergency and states he is in fear for his life.  (Ex. A at 0:02:05 - 0:02:34).  When plaintiff declares he is "going to hang himself right now," Gielow and Larson return to plaintiff's cell door and watch him through the window.  (Ex. A at 0:02:37 - 0:02:58).  Although the camera does not capture what is occurring inside plaintiff's cell, the parties do not dispute that during this time plaintiff was tying a sort of noose around his neck, using a torn piece of blanket, tying the other end of the makeshift ligature to the upper cell bunk, and thus attempting to hang himself.  (Doc. 109, Ex. D at 2; Doc. 23, p. 6; Doc. 154, Ex. A, Smith Decl. ¶ 12).  Outside of plaintiff's cell, the video captures defendant Gielow ordering plaintiff to "Stop!" and "Take that off your neck!"  (Doc. 109, Ex. A at 0:02:58-3:12).  The parties do not dispute that plaintiff continued to attempt to hang himself.  The video captures Sgt. Larson administering one, one-second burst of Oleoresin Capsicum spray (hereinafter "pepper spray," as it is commonly known) into plaintiff's cell through the handcuffing portal.  (Doc. 109, Ex. A at 0:03:12 - 0:03:17; Doc. 109, Ex. D at 2).[4]  Larson's pepper spray canister malfunctions after dispensing 28 grams.  (Doc. 109, Ex. D at 1-2, 40).  Larson leaves to obtain a different canister, and defendant Gielow continues ordering plaintiff to "take that off your neck."  (Doc. 109, Ex. A at 0:03:30 - 0:04:30).  Plaintiff continues his attempt to hang himself, and Larson deploys three one-second bursts of pepper spray (87 grams) through the handcuffing portal.  (Doc. 109, Ex. A

---

4  Oleoresin Capsicum is defined as follows:

> OC – Oleoresin Capsicum (pepper spray) – A inflammatory agent that causes tearing and involuntary closing of the eyes, nasal discharge, sneezing, disorientation, and the sensation of respiratory distress.

FLA. ADMIN. CODE r. 33-602.210(9)(a)1.  (2014).

at 0:04:30 - 0:04:44; Doc. 109, Ex. D at 1-2, 39).  Plaintiff does not claim Sgt Larson's use of pepper spray violated the Eighth Amendment, and has not named Larson as a defendant in this lawsuit.  (*See* Doc. 23 at 7, 11; *see also* Doc. 154, Ex. D, Smith Depo. at  44:1-18, 48:8-13).

What occurs inside plaintiff's cell immediately after Sgt. Larson administers the pepper spray is not captured on camera.  The prison incident report indicates, and plaintiff does not dispute, that plaintiff fashioned a curtain using his blanket, lay down on the lower cell bunk behind the makeshift curtain with one end of the ligature tied around his neck and the other end tied to the upper bunk, and was unresponsive to defendant Gielow's order to go to the handcuffing portal so he could be handcuffed and escorted to the decontamination shower.  (Doc. 109, Ex. D at 2, 30).  Defendant Gielow calls a team of officers to enter plaintiff's cell for a life safety check.  (Doc. 109, Ex. A at 0:04:54; Doc. 109, Ex. D at 2).  Defendant Gielow twice orders plaintiff to "come to the door," to which there is no response.  (Doc. 109, Ex. A at 0:05:30 - 0:05:35).  The officers enter plaintiff's cell and secure plaintiff.  (Ex. A at 0:06:36 - 0:12:21).  The incident report states that when the team of officers entered plaintiff's cell, plaintiff was combative with the officers, refused to submit to restraints, and resisted the officers' attempts to remove the ligature from plaintiff's neck and the upper cell bunk.  (*Id*.).  Plaintiff does not dispute these facts and, even if he did, the dispute would not be material, because plaintiff does not claim the officers who entered his cell (Sergeant Larson, Lieutenant Michael DeLapp, Officer Mark De Lavega and Officer Fredrick Hetherington) used excessive force in removing the ligature, securing him, or preparing him for escort to the shower.  (Doc. 23 at 7, 11; Doc. 154, Ex. D, Smith Dep. at 44:1-18, 48:8-13; 57:11-16).

At approximately 11:46 a.m., the officers begin escorting plaintiff to a shower cell for his post chemical use of force shower. (Doc. 109, Ex. A at 0:12:21). During the escort plaintiff pauses and yells loudly at one of the officers. (Ex. A at 12:55 - 13:03). Defendant Gielow counsels plaintiff. (Ex. A at 13:08). At approximately 11:47 a.m., defendant Gielow leaves the escort and advises Duty Warden Colonel Peters of the situation, including that plaintiff was continuing to create a disturbance by yelling. (Doc. 109, Ex. D at 3, 12). Peters authorized the use of pepper spray if necessary to quell the disturbance. (Doc. 109, Ex. D at 3, 12).

Plaintiff enters the shower cell and officers remove his restraints and the ligature around his neck. (Doc. 109, Ex. A at 0:14:14 - 0:15:11). Defendant Gielow returns and plaintiff begins yelling and making statements to staff such as, "I didn't do nothin'" and "All ya'll white people stick together." (Doc. 109, Ex. A at 15:08-15:27; Doc. 109, Ex. D at 2-3, 30). Defendant Gielow reads plaintiff a final verbal order to cease yelling into the wing, and advises plaintiff that this is his final order, that if plaintiff does not cease his disruptive behavior chemical agents will be administered, and that if plaintiff temporarily ceases his disruptive behavior but then resumes such conduct, Gielow's warning will not be repeated prior to the application of chemical agents. (Doc. 109, Ex. A at 15:27 - 15:50). Plaintiff states he is in fear for his life. (Ex. A at 0:15:51). The officers leave and plaintiff begins yelling to the hand-held camera. (Ex. A at 0:16:07 - 16:10). An officer returns and plaintiff states, "They trying to kill me, man." Plaintiff argues with the officer and then starts repeating "I declare a psychological emergency. I'm in fear for my life." (Ex. A, 0:16:14 - 16:30). The officer orders plaintiff to stop yelling. (Ex. A at 0:16:26). The officer leaves the area and plaintiff begins yelling statements, for example: "They trying to kill me, man;" "I will kill myself. As soon as I get a chance, I will kill

myself before ya'll can kill me;" "You should have let me kill myself, because I'm gonna kill myself any g*d d*amn way;" "I don't care the f*ck what none of ya'll say, ya'll ain't gonna torture me no g*d d*mn more;" "Because I'm black and I write grievances, ya'll can torture me.  Because a black man write grievances;"  "I declare a psych emergency;" "Ya'll roundin' up and gassin' all these helpless black people around here;" "I can't do nothin'" "You've got the KKK and skinhead mother f**kers gassing black people around here for nothing;" "I was on strip for a week because I wrote grievances;" "Ya'll gas the black folk around here.  Ya'll gas the black folk around here.  Ya'll gas the black folk around here.  That's all ya'll do – gas black people;" "I got somethin' to do with it, I'm gonna kill myself before ya'll keep on trying to spray me and torture me;" "I will kill myself first;" "Here comes the  KKK;" "Here comes the KKK;" "How do you expect me to act when I get gassed for nothing;" "All I want is to be left alone, man;" "So what I file grievances?  That's my First Amendment right.  I got a First Amendment right to file grievances if I want to;" "Ya'll don't come and gas me 'cause I file a grievance;" "I declare a psychological emergency."  (Doc. 109, Ex. A at 0:16:32 - 20:00).  When defendant Gielow approaches the shower cell, plaintiff states (pointing to Gielow), "This guy has gassed over 300 people in 18 months.  He has gassed over 300 people in 18 months."  (Ex. A at 20:11 - 20:18).  An officer orders plaintiff to finish his shower and be quiet.  (Ex. A at 0:20:21).  Plaintiff continues yelling similar statements.  (Ex. A at 0:20:22 - 0:20:37).  The water in plaintiff's shower is turned off.  An officer counsels plaintiff to cease his disruptive behavior and tells plaintiff that when the water is turned back on he must finish his shower and stop being disruptive.  (Ex. A at 20:38 - 21:46).  The water is restored, plaintiff begins yelling the same statements again, and the same officer orders plaintiff, three times, to stop yelling and to finish his shower.  (Ex. A

at 21:48 - 23:20).  Plaintiff continues yelling to the camera, this time repeating,"I'm in fear for my life;" "Gasser Gielow, that's what they call him.  Gasser Gielow. Because he gasses all black people . . . Gasser Gielow."  (Ex. A 0:23:38 - 23:52). Plaintiff continues his tirade, at one point stating (either to Sgt. Larson or to the camera): "Let me gas you, and let me hold that camera, and let me see how you act." (Ex. A at 24:06 - 24:14).  Another officer arrives and orders plaintiff to "knock it off." (Ex. A at 24:18).  Plaintiff yells at the officer.  (Ex. A at 24:18 - 24:30).  Plaintiff declares a psychological emergency and demands to see a captain or the warden.  (Ex. A at 24:34 - 24:37).  Defendant Gielow leaves the area and plaintiff continues yelling. (Ex. A at 24:40 - 26:14).

At approximately 12:00 p.m., Behavioral Specialist Jeffrey Arney arrives at the shower cell and attempts to interview plaintiff regarding his psychological emergency.  (Doc. 109, Ex. A at 0:26:15; Doc. 109, Ex. D at 34).  Plaintiff continues yelling into the wing, begins yelling at the behavioral specialist and becomes more and more agitated until his behavior is deemed a security issue and the Arney interview is terminated.  (Doc. 109, Ex. A at 26:15 - 28:36; Doc. 109, Ex. D at 34). Plaintiff is released back to security and continues yelling and being disrespectful to staff.  (Doc. 109, Ex. A at 27:00 - 29:30).  At 12:03 p.m., defendant Gielow administers three, one-second bursts of pepper spray at plaintiff through the shower cell door (totaling 158 grams).  (Doc. 109, Ex. A at 29:30 - 29:33; Doc. 109, Ex. D at 2-3, 30, 41).  Plaintiff  ceases yelling, complies with orders and is allowed to re-shower.  (Doc. 109, Ex. A at 29:34 - 48:08; Doc. 109, Ex. D at 2-3, 30).  Plaintiff finishes his shower, is secured and, at approximately 12:22 p.m., is escorted from the shower cell to the medical triage room for a post use of force medical examination.

(Doc. 109, Ex. A at 48:13 - 50:45; Doc. 109, Ex. D at 2-3, 24-25, 30).  No injuries are noted.  (Doc. 109, Ex. D at 24).  Plaintiff is treated with an eyewash.  (*Id.*).

After plaintiff returns from medical, he is not issued a mattress, linens or personal property due to his attempts at self harm.  (Doc. 109, Ex. D at 26).

Plaintiff states in the amended complaint that as a result of defendant Gielow's use of pepper spray, "Plaintiff loss [sic] most of his eyesight in his left eye and was sent to an outside hospital."  (Doc. 23, p. 7).  At his deposition, however, plaintiff conceded that his eyesight returned shortly after the incident.  (Doc. 154, Ex. D, Smith Dep. at 53:22-25, and 55:1-25 - 56:1-18).  Plaintiff nonetheless states in his supporting affidavit, "A few weeks later [after the August 16, 2011 incident], I had to go to the hospital because my vision continued to be blurry.  I still have some eye problems to this day."  (Doc. 154, Ex. A, Smith Decl. ¶ 16).  Defendants have submitted plaintiff's prison medical/optical records.  (Doc. 109, Ex. P).  Plaintiff's medical records establish that plaintiff has worn corrective lenses since at least 2007 (doc. 109, Ex. P at 3); that on December 19, 2011, plaintiff was referred to a specialist due to a decline in his visual acuity (Ex. P at 6); that plaintiff was seen by optometrist, John Tugwell, O.D., on January 5, 2012 (Ex. P at 7); that Dr. Tugwell noted "cupping," an increase in intra-ocular pressure and "glaucoma suspect - visual field," but noted nothing suggesting eye damage or injury due to chemical exposure (Ex. P at 7); and that Dr. Tugwell ordered follow up as needed.  Plaintiff has not submitted any medical evidence to support his speculative and vague suggestion that his eyesight was damaged due to defendant Gielow's use of pepper spray.  Plaintiff has, thus, not created a genuine issue of fact for trial to rebut the medical evidence that plaintiff did not sustain an eye injury, or any physical injury, related to the August 16, 2011 use of pepper spray.  *See Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th

Cir. 2010) ("Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.")

All of the prison officials involved in the August 16, 2011 incident (Colonel Peters, defendant Lieutenant Gielow, Sergeant Larson, Lieutenant DeLapp, Officer De Lavega and Officer Hetherington) prepared a report of the incident, which was reviewed by the Warden, the Institutional Inspector and the OIG. (Doc. 109, Ex. D). Plaintiff refused to provide a written or verbal statement. (*Id*., Ex. D at 36). Due to plaintiff's allegations on the videotape, the Warden submitted a "MINS" report and independently referred plaintiff's allegations to the OIG. (Doc. 109, Ex. D at 1). The Bureau of State Investigations reviewed plaintiff's allegations and the evidence of the August 16, 2011 use of force, and found plaintiff's allegations unsubstantiated. (Doc. 109, Ex. H at 15).

Yelling into the wing is against the rules of the Florida Department of Corrections. (Doc. 109, Ex. M, Kolodziej Decl. ¶ 3). Inmates may not yell and disrupt dorm operations for security and safety reasons. Yelling into a wing severely cuts down on the ability of officers to hear what is going on in that wing. (*Id*.). Officers may not hear an inmate's or an officer's plea for help or other issues that arise from time to time. (*Id*.). In addition, officers have a more difficult time communicating with each other when an inmate is yelling. (*Id*.). Yelling in general, and especially yelling inflammatory statements, may spark a riot in the wing. (*Id*.). Inmates, for rehabilitative and security reasons, must follow DOC rules and follow the lawful orders of officers. (*Id*.).

Plaintiff received a disciplinary report for his disruptive behavior preceding the acts of self harm (*see* discussion of disciplinary reports above), but received no

disciplinary reports from August 17, 2011, through the end of 2011.  (Doc. 109, Ex. N at 2).

<u>February 4-8, 2012 Property Restriction</u>

On February 4, 2012, defendant Barnes wrote a "fictitious" DR and a "fictitious" Incident Report asserting that he approached plaintiff's cell at 6:30 p.m.; that plaintiff had his personal and state-issued property all over the cell floor; that Barnes twice ordered plaintiff to clean up the property; and that plaintiff refused to clean it up.  (Doc. 23, p. 8 ¶¶ 13-14 and Ex. E, p. 3; Doc. 154, Ex. A, Smith Decl. ¶ 17; Doc. 109, Ex. I at 1).  Defendant Barnes' DR charged plaintiff with Disobeying a Verbal or Written Order.  (Doc. 109, Ex. I at 1).  Defendant Barnes explained to plaintiff his reasons for writing the reports.  Plaintiff's complaint describes Barnes' explanation as:  "Lt. Gielow said that this is for black history month in hopes that you would want to go to Africa after freezing your ass off niggerboy."  (Doc, 23, p. 8 ¶ 13).  Plaintiff's grievance concerning the incident describes Barnes' explanation as: "Sgt. Dufrene ordered me to strip you, so don't sweat me about it"; followed by Sergeant DuFrene's explanation that, "After all those grievances you filed on me and Johnson, you're right back in the same situation.  You're going to realize that niggers don't run shit at Santa Rosa.  Oh, and I ensure [sic] you that no heat will blow out your vent while you're on strip.  Stay warm."  (Doc. 23, Ex. E, p. 5).  Sergeant DuFrene is not a party to this lawsuit.

Plaintiff asserts that defendant Barnes' disciplinary and incident reports were fabricated and motivated by retaliation for plaintiff's filing grievances.  The DR was dismissed due to video evidence showing that defendant Barnes did not approach plaintiff's cell door as he reported.  (Doc. 154, Ex. A, Smith Decl. ¶ 17; Doc. 154, Ex. D, Smith Dep. at 64:25 - 65:1-14; *see also* Doc. 109, Ex. K at 2 (reflecting no

disciplinary conviction for February 4, 2012)).  Based on Barnes' Incident Report, Lieutenant Freddy Johnson recommended plaintiff's placement on Procedural Security Enhancement (Property Restriction), "due to [plaintiff's] refusal to properly store his personal and state property."  (Doc. 109, Ex. I at 1).  Defendant Kolodziej and Warden Tifft approved the action.  (*Id.*). The terms of the strip cell (plaintiff, having an understandably different perspective than prison officials, characterizes the status of Property Restriction as strip cell) were that plaintiff was allowed a pair of boxer shorts and a pair of shower slides, but no bedding or property.  (Ex. I at 3). Plaintiff was on property restriction from approximately 6:30 p.m. on February 4, 2012, until approximately 2:00 p.m. on February 8, 2012.  (Doc. 109, Ex. I at 2 and Ex. G).  Plaintiff's physical appearance and attitude were assessed four times per day. (Doc. 109, Ex. G at 1).  Plaintiff's physical appearance and attitude were entered as "Satisfactory" at each assessment, with the exception of February 7, 2012, which is explained below.  (*Id.*).[5]

Plaintiff alleges that as a result of Barnes' false accusations, plaintiff was placed "in an empty, freezing cold cell, naked, for four days with the window locked opened [sic]."  (Doc. 23, p. 8 ¶ 13).  Defendants have submitted historical weather data for Milton, Florida for February 4, 2012, through February 8, 2012.  (Doc. 109, Ex. F).  The weather data shows the following high and low temperatures in degrees Fahrenheit:

| Date | High | Low |
| --- | --- | --- |
| February 4, 2012 | 73 | 59 |

---

[5] The range of options for rating plaintiff's physical appearance and attitude were:  Excellent - (E), Very Good - (VG), Good - (G), Satisfactory - (S), Fair - (F), Poor - (P), and Unsatisfactory - (U). (Doc. 109, Ex. G at 2).

| February 5, 2012 | 69 | 54 |
| February 6, 2012 | 61 | 50 |
| February 7, 2012 | 72 | 50 |
| February 8, 2012 | 68 | 44 |

(Doc. 109, Ex. F).  Plaintiff does not dispute this data.

Defendants also submitted evidence that plaintiff's dormitory had heaters and that the thermostat on the heaters was set by maintenance personnel at 70 degrees. (Doc. 109, Ex. L, Barnes Decl.).  Plaintiff admits that the heat was on in his cell during the 7-3 (daytime) shift.  (Doc. 153, p. 12 ¶ 4; *see also* Doc. 23, Ex. E, p. 5 - Grievance Log #12-6-05251).  The evidence submitted, however, does not dispel all genuine factual dispute as to the actual temperature in plaintiff's cell, given plaintiff's allegations that his cell window was "locked open" and that there was no heat between 3:00 p.m. and 7:00 a.m.

On February 7, 2012, Sergeant Ricky Dufrene prepared an Incident Report stating that at approximately 5:45 p.m., he approached plaintiff's cell and observed plaintiff wearing a set of "state issued blues."  (Doc. 109, Ex.  I at 2).  Plaintiff told Dufrene he got the clothing the night before (February 6, 2012), from a sergeant working in the dormitory.  (*Id*.).  A search of plaintiff's cell revealed that in addition to the state issued pants and shirt, plaintiff also had a state issued jacket, a radio, a soap dish and a towel in his cell.  (Doc. 109, Ex, I at 2, and Ex. G).  The items and clothing were confiscated and plaintiff's property restriction was extended one day, until February 8, 2012, by Lieutenant Michael DeLapp.  (*Id*.).  Plaintiff does not dispute he was in possession of the items, including clothing, from the evening of February 6, until the evening of February 7, 2012.  (Doc. 154).  Plaintiff also does not dispute that his property restriction would have ended on February 7, 2012, had he

not possessed the prohibited property, and that the reason the property restriction was extended by one day was his violation of the property restriction. (Doc. 154). Thus, no genuine factual dispute exists that the property restriction arising from Barnes' actions resulted in plaintiff's confinement on "strip" with nothing but boxer shorts and shower slides <u>from the evening of February 4, 2012, until the evening of February 6, 2012</u> (when plaintiff received the "state issued blues", wore the blues from February 6 to February 7, 2012, was caught by Sgt. Dufrene, and was extended on property restriction another day until February 8, 2012).

After defendant Barnes' DR was dismissed, classification officer Deidrick (a non-party) stated, "Don't think you got away, Smith. We have a surprise for you." (Doc. 154, Ex. C, Grievance Log Number 12-6-06832). Later that day, on February 8, 2012, Sergeant Dufrene issued plaintiff a fresh disciplinary report for "Spoken Threats" (Log #119-120357), alleging plaintiff said to Dufrene: "My people's money got me that radio and I will have my people get your job for taking it. I know how to write a cracker up and I will continue to write everybody up until either I am moved out of this dorm or I get everybody who works in here in this shifts job. One way or another." (Doc. 109, Ex. K at 1). Plaintiff was convicted of the Dufrene DR after receiving written notice, being afforded the opportunity to present evidence, and receiving a written statement from the DR hearing team of the evidence they relied on and the reasons for the disciplinary action. Plaintiff was sentenced to 30 days in disciplinary confinement. (Doc. 109, Ex. K at 1 and Ex. N at 2).

On February 13, 2012, defendant Kolodziej received an informal grievance from plaintiff (dated February 7, 2012) in which plaintiff alleged he was "jumped on, denied meals, denied recreation, stripped, denied showers and maliciously gassed" since his return to Santa Rosa CI. (Doc. 109, Ex. H at 4-5). Defendant Kolodziej

referred plaintiff's allegations to the OIG and submitted a MINS report.  (Doc. 109, Ex. H at 3-5).

On February 23, 2012, plaintiff stopped defendant Kolodziej during rounds "to explain what was happening to him and to ask to be relocated."  (Doc. 23, p. 8 ¶ 15).  Kolodziej told plaintiff:  "I don't care what they do to you.  I'm not moving you.  You wrote me enough for me to be familiar with your situation, however you must be aware of the consequences for filing grievances on my officers.  Oh, and you keep writing that you're going to kill yourself if my officers don't leave you alone.  I wish that you would get it over with because it only gets worse from here, I promise."  (Doc. 154, Ex. A, Smith Decl. ¶ 18; *see also* Doc. 23, p. 8 ¶ 15).  Kolodziej then told defendant Sergeant McMackin, to "put Plaintiff back on strip and to gas him at his earliest convenience."  (Doc. 23, p. 8 ¶ 15).[6]  On February 24, 2012, defendant McMackin put plaintiff back "on strip".  (*Id*., p. 9 ¶ 16).

On February 28, 2012, defendant Shaner told plaintiff "to get ready, because he [Shaner] wanted to gas [plaintiff] while he was still naked on strip."  (Doc. 23, p. 9 ¶ 17).  Before Shaner could return, plaintiff stopped a nurse (Ms. Adams) and declared a psychological emergency.  Plaintiff explained "what's been going on and his intentions to commit suicide."  (*Id*.).  After the interview, plaintiff was taken off "strip" and provided clothing.  (*Id*.).

<u>February 29, 2012 Use of Force</u>

On February 29, 2012, defendant Officer Hall approached plaintiff's cell and stated, "It's finally your turn to learn, Smith."  (Doc. 154, Ex. A, Smith Decl. ¶ 20).

---

6  Plaintiff's sworn affidavit in opposition to summary judgment states that defendant Kolodziej made a more ambiguous statement to "the sergeant," to the effect of:  "'You know what to do,'" to which "the sergeant" replied, "'I'll be happy to handle this for your sir.'"  (Doc. 154, Ex. A, Smith Decl. ¶ 19).

Defendant Shaner then approached plaintiff and stated, "There's no psych nurse to save you today, Smith, so get ready. If you let me gas you twice in the face, I will let you keep your property. If you don't, I'll take all your sh*t and gas you all week." (Doc. 23, p. 9 ¶ 18; Doc. 154, Ex. A, Smith Decl. ¶ 20). Plaintiff responded that he would hang himself. (Doc. 154, Ex. A, Smith Decl. ¶ 21).

At 1:03 p.m. on February 29, 2012, defendant Shaner contacted Warden Tifft and informed Tifft that plaintiff was creating a disturbance in G-dormitory by kicking on his cell door and yelling obscenities into the wing, and that plaintiff received several orders to cease his disruptive behavior but refused all orders. (Doc. 109, Ex. E at 8, 17). Defendant Shaner obtained Tifft's authorization to use pepper spray if necessary to quell the disturbance. (*Id*.).

Additional video evidence depicts defendant Shaner and defendant McMackin standing in front of the hand-held camera at 1:13 p.m. on February 29, 2012. (Doc. 109, Ex. B1 at 0:00:00).[7] Defendant Shaner reports that plaintiff was creating a disturbance at 12:15 p.m., by kicking his cell door and yelling obscenities into the wing. (Ex. B1 at 0:00:27 - 0:00:35). Defendant McMackin states that he was called into G-dormitory by Officer Hall who reported plaintiff was yelling and kicking his cell door; that McMackin entered the wing and witnessed plaintiff yelling into the wing and kicking his cell door; that McMackin counseled plaintiff to cease his disorderly conduct; and that plaintiff refused to comply with all orders. (Ex. B1 at 0:00:45 - 0:00:59). Defendant Shaner states that he, too, counseled plaintiff to cease his disruptive behavior and that plaintiff refused and continued kicking his cell door

---

7 Defendants' Exhibits B1 and B2 are digital video disks (DVDs) with audio, filed under seal, which capture part of the events occurring on February 29, 2012. The times referenced are the hand-held video's runtime noted in the upper right hand corner of the video.

and yelling obscenities into the wing.  (Ex. B1 at 0:01:00 - 0:01:08).  Defendants Shaner and McMackin proceed through the dormitory to plaintiff's cell door.  As they proceed, no yelling is audible.  (Ex. B1 at 0:01:50 - 0:02:30).  Defendant Shaner arrives at plaintiff's cell door and addresses plaintiff.  Plaintiff responds, "Yes, sir." (Ex. B1 at 0:02:28 - 0:02:31).  Plaintiff is not yelling or kicking his door.  (*Id*.). Defendant Shaner, reading from a piece of paper, informs plaintiff that he is giving plaintiff a final order to cease his disruptive behavior and if plaintiff continues his disruptive behavior chemical agents will be administered.  (Ex. B1 at 0:02:34 - 0:02:40).  Defendant Shaner asks plaintiff if he understands, and then pauses for four seconds, during which plaintiff is silent.  (Ex. B1 at 0:02:40 - 0:02:44).  Defendant Shaner states "You won't cease?"  (Ex. B1 at 0:02:44).  Plaintiff responds, but his response is inaudible.  (Ex. B1 at 0:02:44-2:48).  Defendant Shaner states, "Inmate Smith, since you've refused to cease your disruptive behavior . . ." and then informs plaintiff that he is preparing for the administration of chemical agents.  (Ex. B1 at 0:02:49 - 0:02:55).  Plaintiff appears at his cell door window with a makeshift noose tied around his neck, tells Shaner he is going to hang himself, and leaves the cell door window.  (Ex. B1 at 02:54 - 02:58).  Defendant Shaner twice orders plaintiff to "get that noose off your neck," (Ex. B1 at 02:58 - 0:3:08), and then directs defendant McMackin to spray the pepper spray through the handcuffing portal.  (Ex. B1 at 0:03:08).  Defendant McMackin deploys pepper spray (81 grams) through the handcuffing portal.  (Ex. B1 at 0:03:08 - 0:03:13; Ex. E at 9, 47).  Both Shaner and McMackin yell several orders to "get down" and "get it off."  (Ex. B1 at 0:03:14 - 0:3:20).  Defendant Shaner calls for an extraction team, a shield and ligature cutters. (Ex. B1 at 0:03:35 - 0:03:42).  Shaner and McMackin give plaintiff several more orders to get down, and McMackin tells plaintiff he will be seen by mental health.

(Ex. B1 at 0:03:42 - 0:04:22).  What occurs inside plaintiff's cell during this time is not captured on camera, but the parties do not dispute that plaintiff was hanging himself from the upper bunk and that he temporarily lost consciousness.  (Doc. 154, Ex. A, Smith Decl. ¶21; Doc. 134, p. 7 ¶ 2).

The extraction team arrives at 1:18 p.m.  (Doc. 109, Ex. B1 at 0:05:07).  Plaintiff's cell door is breached.  Defendant Hall (with the shield), defendant Pugh, defendant Martillano, defendant Shaner, defendant McMackin and defendant Wallace enter plaintiff's cell.  What happens inside plaintiff's cell is not fully captured on camera.  Plaintiff alleges he awoke on the cement floor just as defendant Hall was "land[ing] a heavy knee on [plaintiff's] left eye socket."  (Doc. 23, p. 10 ¶ 20).  Plaintiff states he offered no resistance, but defendant Hall jumped up again and landed another knee on plaintiff's head with enough force that defendant Shaner whispered to Hall, "Stop it, Hall, or you'll kill him."  (*Id*., p. 10 ¶ 20; Doc. 154, Smith Decl. ¶ 22).  As this was going on, defendant Pugh was twisting plaintiff's leg and defendant Wallace was squeezing plaintiff's testicles.  (*Id*.).  Another prison official (Captain Smith) ran into the cell and began pulling the officers off plaintiff.  (*Id*.).  Defendants dispute  plaintiff's foregoing version of the force used by the extraction team  as well as plaintiff's allegation that he did not resist.  (Doc. 134, p. 7).

Defendants claim that plaintiff's resistance can be clearly heard on the video and viewed in part.  (Doc. 153, p. 7 (*citing* Ex. B1 at 5:25 - 7:30)).  Based upon the undersigned's review of the video, the scene inside plaintiff's cell during the incident is almost completely obstructed by officers standing in the cell's doorway.  (Ex. B1 at 0:05:25 - 0:07:00).  The video evidence is quiet during the first few seconds of the officers' entry into plaintiff's cell.  (Ex. B1 at 0:05:35 - 0:05:43).  The video then captures  sounds  of officers  coughing  and yelling instructions,  including "Quit

resisting!" (Ex. B1 at 0:05:44 - 0:06:32). Plaintiff does not appear in view until 1:19 p.m., approximately 1½ minutes after the officers enter his cell, at which time he is on the floor. (Ex. B1 at 0:06:32). The video depicts plaintiff moving and screaming, and an officer repeatedly yelling, "Put your hands behind your back!" (Ex. B1 at 0:06:28 - 0:07:03). The summary judgment evidence does not resolve, however, whether plaintiff is moving due to his resistance (as defendants allege) or due to applications of force (for example, someone jerking the ligature around his neck). (*Id.*). At one point while plaintiff is on the floor with several officers securing him, plaintiff receives what a reasonable juror could interpret as a blow to the head, and cries out in pain. (Ex. B1 at 0:06:44 - 0:06:47).

Plaintiff asserts that while showering, he "made an assessment of his injuries and discovered several huge knots on his head. Both eyes were swollen shut and bleeding. Plaintiff's nose would not stop bleeding, and several teeth was loose and bleeding." (Doc. 23, p. 10 ¶ 22). The video evidence, however, establishes that plaintiff's eyes were not swollen shut or bleeding, and that plaintiff had no trouble seeing where he was going during the escorts to and from the shower, which included navigating stairs and doorways. (Doc. 109, Ex. B1 at 0:07:38 - 0:09:33, and 0:20:43 - 21:30, and 0:29:40 - 0:31:17). Plaintiff was escorted from the shower and arrived at the medical department at 1:34 p.m. (Ex. B1 at 0:021:24).

Plaintiff alleges that as a result of defendant McMackin's use of pepper spray and defendants Hall's, Wallace's, Pugh's and McMackin's use of force during the cell extraction, plaintiff suffered the following injuries: "[M]y face and knee were swollen, my spine and arm were injured. My leg suffered a soft tissue injury and still swells up. Medical never followed up on my complaints of pain with a test that would show cartilage injuries." (Doc. 154, Ex. A, Smith Decl. ¶ 24). Medical

personnel conducted a post use of force examination on plaintiff and noted the following injuries: redness on the left inner knee, a small abrasion to the left eyelid and a small bruise just above the left eyelid. (Doc. 109, Ex. E at 9, 27-28). Plaintiff does not further explain, nor does the medical evidence note, loose and bleeding teeth, conditions that, quite obviously would not self-resolve in a matter of minutes. Plaintiff received a mental health evaluation by Senior Behavioral Analyst Dr. Janel Riddle, who placed plaintiff in Self Harm Observation Status. (Doc. 109, Ex. E at 36). Plaintiff was placed in an infirmary cell for observation and, 24 hours later, was discharged to security in stable condition. (Doc. 109, Ex. P at 1). On April 30, 2012, plaintiff saw Dr. Tugwell, O.D. due to plaintiff's claim that he sustained an eye injury during a use of force. (Doc. 109, Ex. P at 2). Dr. Tugwell examined plaintiff, but noted no problems or changes from plaintiff's previous examination. (*Id*.).

The officers involved in the February 29, 2012 cell extraction also sustained various injuries. Defendant Hall had a red and slightly swollen left eye and a superficial abrasion to his right chest; Officer Martillano had a handprint on his right forearm and a bruise on his right bicep; and defendant McMackin had a red mark on his right bicep. (Doc. 109, Ex. E at 10, 19-26).

## DISCUSSION

Legal Standards

A.     Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Generally, a court must view the facts in the light most favorable to the non-moving party (here, plaintiff) and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). The court may not, however, accept any facts that are "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Scott*, 550 U.S. at 380, 127 S. Ct. at 1776. Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 F. App'x 867, 869-70 (11th Cir. 2011).

B.   Qualified Immunity Standard

Defendants assert they are entitled to qualified immunity because the video and other summary judgment evidence demonstrates that no constitutional violation occurred. (Doc. 153, p. 1). Qualified immunity shields government officials from

individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct. *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). Qualified immunity seeks to ensure that individuals can reasonably anticipate when their conduct may give rise to liability, and hence, liability only attaches if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right. *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999) (*citing United States v. Lanier*, 520 U.S. 259, 270, 117 S. Ct. 1219, 137 L. E d.2d 432 (1997)).

　　To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id*. at 1194.

　　The Supreme Court has established a two-pronged test for evaluating a claim of qualified immunity: (1) whether a constitutional right has been violated on the facts alleged; and (2) whether the right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). The court may exercise its sound discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). The court may grant qualified immunity if the plaintiff fails to carry his burden on either of the two prongs. *See, e.g.*, *Pearson*, 555 U.S. at 243-245, 129 S. Ct. at 822-23 (evaluating

only *Saucier*'s second prong and holding that law enforcement officers were entitled to qualified immunity because the unlawfulness of their conduct was not clearly established).

C.    Eighth Amendment Standard

"To show a violation of [his] Eighth Amendment rights, plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1319 (11th Cir. 2005 (quotation omitted).  "To be deliberately indifferent a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 1319-20 (quotations omitted).  Simple negligence is not actionable under § 1983, and a plaintiff must allege "a conscious or callous indifference to a prisoner's rights." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).  Prison officials may avoid Eighth Amendment liability by, *inter alia*, showing: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 1982-83, 128 L. Ed. 2d 56 (1994).'

"The Eighth Amendment's proscription of cruel and unusual punishment . . . governs prison officials' use of force against convicted inmates." *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).  "[I]n making and carrying out decisions

involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). Thus, "[w]here a prison security measure is undertaken to resolve a disturbance, . . . that indisputably poses significant risks to the safety of inmates and prison staff, . . . the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id*. at 320-21, 106 S. Ct. at 1085 (internal quotation marks omitted).

The Supreme Court also articulated this standard for determining whether prison officials are entitled to judgment as a matter of law on an excessive force claim:

> [C]ourts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

*Id*. at 322, 106 S. Ct. at 1085. As the Eleventh Circuit has recognized, the Supreme Court outlined five factors relevant to ascertaining whether force was used "maliciously and sadistically for the very purpose of causing harm": (1) the extent of the injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to

them.  *Campbell*, 169 F.3d at 1375 (*citing Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085); *see also Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (applying the same five-factor test set forth in *Whitley* ).

D.     First Amendment Retaliation Standard

The First Amendment prohibits a prison official from retaliating against an inmate for exercising his free speech rights, including the right to complain about the conditions of his confinement and to file prison grievances. *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "An inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were the result of the inmate's having filed a grievance concerning the conditions of his imprisonment." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (quotation marks and brackets omitted).  A First Amendment retaliation claim requires an inmate to prove that "(1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct." *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013) (*citing Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)).  The causation element requires the plaintiff to show that the defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights.  *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).

Application of Summary Judgment Standard to Plaintiff's Claims

A.     First Amendment Retaliation And Eighth Amendment Excessive Force Claims Against Defendant Gielow For Gielow's August 16, 2011 Use Of Pepper Spray

Plaintiff claims defendant Gielow's use of pepper spray in the decontamination shower on August 16, 2011, was in retaliation for plaintiff's filing grievances against

Gielow, in violation of plaintiff's First Amendment right to free speech, and was excessive, in violation of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.  (Doc. 23).  The summary judgment evidence, however, establishes that defendant Gielow's use of pepper spray was not retaliatory or wanton, because plaintiff was being disruptive by continually yelling into the wing and refusing to comply with orders to cease his disruptive behavior.

The video evidence establishes that plaintiff did not comply with defendant Gielow's and other officers' orders to stop yelling.  Plaintiff counters that he was justified in his behavior and that there are genuine issues of material fact with regard to the reason defendant Gielow used pepper spray.  (Doc. 153).  Plaintiff characterizes his yelling into the wing for ten minutes while showering as "recount[ing] for the camera the abuse [he] had been threatened with and was being subjected to", and asserts he "was not being disruptive but rather, trying to communicate what was happening to [him] to whatever corrections officials might look at the video."  (Doc. 154, Ex. A, Smith Decl. at ¶¶ 13-14).  Plaintiff asserts that "Lt. Gielow personally sprayed me in the face three times with chemical agents to force me to stop speaking."  (Doc. 154, Ex. A, Smith Decl. ¶ 15).  No reasonable jury could conclude plaintiff's speech was a fearful plea for help, a mere "present[ation] of] his allegations of abuse," or a non-disruptive speech (doc. 153 at 6), because the video evidence blatantly contradicts this characterization.

Viewing the facts in the light depicted by the video, plaintiff's speech to the camera was an angry, defiant tirade against the officers, peppered with expletives, inflammatory remarks and racial slurs.  Plaintiff was disruptive during the escort to the shower, was given a final order and warning to cease his disruptive behavior, and repeatedly ignored defendant Gielow's final order and warning.  Defendant Gielow

and the other officers tolerated plaintiff's yelling, (replete with name-calling, expletives and racial slurs), for over ten minutes before again ordering plaintiff, several times, to be quiet and finish his shower.  Plaintiff refused to comply with every order he was given.  The summary judgment evidence demonstrates that, considering the nature of plaintiff's actions as depicted in the evidence, defendant Gielow would have used the pepper spray regardless of the subject of plaintiff's complaint or whether plaintiff had previously filed grievances.  *O'Bryant*, 637 F.3d at 1217 (reiterating that to meet the third element, causation, a prisoner bears the burden of showing that his protected speech was a motivating factor behind the actions taken by prison officials).  The summary judgment evidence also demonstrates that necessary and non-excessive force was used in a good faith effort to restore order and discipline and not maliciously.  *Whitley*, 475 U.S. at 320-21; *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) ("Pepper spray is an accepted non-lethal means of controlling unruly inmate[,] . . . [and a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders"), *overruled in part on other grounds*, *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).  Officers attempted to temper the severity of their response by first counseling plaintiff (repeatedly), turning the water off in plaintiff's shower and allowing plaintiff to counsel with a behavioral specialist.  None of these efforts succeeded.  Plaintiff's continued recalcitrance and disruptive behavior in the face of repeated attempts to gain his compliance by less forceful means justified defendant Gielow's use of pepper spray.

No genuine issues of fact exist for trial concerning defendant Gielow's August 16, 2011 use of pepper spray.  Defendant Gielow's use of pepper spray was neither retaliatory nor wanton.  Defendant Gielow is entitled to summary judgment on

plaintiff's retaliation and excessive force claims arising from the August 16, 2011 use of pepper spray.  This conclusion also forecloses plaintiff's constitutional claims against defendant Kolodziej arising from Gielow's August 16, 2011 use of pepper spray.

> B.    First Amendment Retaliation And Eighth Amendment Conditions Of Confinement Claims Against Defendant Barnes For Barnes' Fabrication Of February 4, 2012 Incident Involving Plaintiff's Property

Plaintiff claims defendant Barnes threatened him, fabricated a DR against him and fabricated an Incident Report against him on February 4, 2012, in retaliation for plaintiff's filing grievances.  Plaintiff also claims the conditions of the "strip cell" arising from Barnes' fabrication qualify as unconstitutional cruel and unusual punishment.  (Doc. 23).  Defendant Barnes argues that plaintiff cannot establish a First Amendment claim of retaliation against Barnes, because Lt. Johnson recommended plaintiff for property restriction, not Barnes; thus, plaintiff cannot establish causation.  (Doc. 134, pp. 18-19).  Defendant Barnes argues plaintiff cannot establish Barnes violated the Eighth Amendment because:  (1) Barnes did not place plaintiff on property restriction and had no authority to place an inmate on property restriction; (2) it was Lt. Johnson, a non-party, who recommended plaintiff's placement on property restriction; (3) plaintiff could not have been subjected to freezing temperatures because the weather never got that cold and the dormitory had heaters; (4) during the time frame in question, plaintiff was checked several times every day and his appearance was deemed satisfactory (with the exception of the day he was found to have clothing he was not authorized to have); (5) even if plaintiff's allegations are taken as true, there is no constitutional violation because plaintiff has no right to be confined in a cell with bedding and clothes.  (Doc. 134, pp. 14-15).

Plaintiff counters:  (1) that but for Barnes' fabricating plaintiff's conduct and submitting the fictitious Incident Report, plaintiff would not have been subjected to for property restriction; (2) that genuine factual disputes exist concerning Barnes' motivation for fabricating the incident and disciplinary reports; and (3) that genuine factual disputes remain concerning the temperature in plaintiff's cell, especially given defendants' historical weather data evidence.  (Doc. 153, pp. 18-19).

The parties do not dispute that plaintiff's writing grievances amounts to constitutionally protected conduct.  Plaintiff's sworn assertions of the close temporal proximity between his grievances and Barnes' allegedly fictitious reports, as well as Barnes' and Dufrene's remarks accompanying Barnes' reports, create genuine factual issues as to whether Barnes was subjectively motivated to fabricate the incident so plaintiff would be disciplined for writing grievances.  The Incident Report itself supports a reasonable inference that plaintiff would not have been recommended for property restriction had Barnes not falsely reported plaintiff had his property spread across the floor and refused to pick it up.  Defendant Barnes is not entitled to summary judgment on plaintiff's First Amendment retaliation claim.

The cruel and unusual punishment claim against Barnes calls for separate analysis.  Concerning this conditions of confinement claim against Barnes, as set forth in the "Facts" section above, undisputed facts show that the property restriction arising from Barnes' actions resulted in plaintiff's confinement on "strip" with only boxer shorts and shower slides from the evening of February 4, 2012, until the evening of February 6, 2012 (when plaintiff received the "state issued blues", wore the blues from February 6 to February 7, 2012, was caught by Sgt. Dufrene, and was extended on property restriction an additional day to February 8, 2012). Nevertheless, the court need not decide whether plaintiff has established the existence of a genuine

factual dispute concerning the objective severity of the strip cell conditions, because plaintiff has not proffered evidence satisfying the subjective component of the deliberate indifference test.  Plaintiff fails to establish a genuine issue for trial concerning Barnes' subjective knowledge that his fabrication of plaintiff's behavior would expose plaintiff to a substantial risk of serious harm.  Barnes asserts, and plaintiff does not dispute, that in February of 2012, the dormitory holding plaintiff had heaters in it; that the thermostat for the heaters was set at 70 degrees; that Barnes did not have access to the thermostat; that to Barnes' knowledge only maintenance personnel had access to the thermostat; and that in Barnes' experience the heaters kept the cells very warm in the winter.  (Doc. 109, Ex. L, Barnes' Decl. ¶ 1). Importantly, plaintiff does not allege, or present evidence from which a reasonable inference could be drawn, that Barnes knew plaintiff's cell window was "locked open", or that the heat did not come on during the overnight hours from 7:00 p.m. - 3:00 a.m.  Without any evidence that defendant Barnes was actually aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, *and* that Barnes actually drew that inference, plaintiff cannot establish defendant Barnes was deliberately indifferent to a substantial risk of serious harm posed by fabricating the incident leading to plaintiff's placement on "strip."  *See Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008); *see also, e.g.*, *Bennett v. Chitwood*, 519 F. App'x 569, 575 (11th Cir. May 23, 2013) (holding that even *if* prisoner's allegations of cold were enough to constitute clearly a substantial risk of serious harm, prisoner failed to proffer evidence satisfying subjective component of deliberate indifference test, where prisoner presented no evidence that he notified defendant jail officials specifically that he was excessively cold and thus failed to establish both that defendant jail officials were actually aware of facts from which the

inference of a substantial risk of serious harm could be drawn and that they actually drew that inference).   Defendant Barnes is entitled to summary judgment on plaintiff's Eighth Amendment deliberate indifference claim.

C.   Eighth Amendment Excessive Force Claim Against Defendant McMackin For McMackin's Use of Pepper Spray on February 29, 2012

Plaintiff claims defendant McMackin's use of pepper spray on February 29, 2012, was excessive because plaintiff was not creating a disturbance.  (Doc. 23; Doc. 153, p. 9).  Defendants assert the video evidence establishes that McMackin's use of pepper spray was a spontaneous and necessary use of force to deter plaintiff's actions of self harm.  (Doc. 134, p. 7 ¶ 2 and pp. 10-11).  Defendant McMackin asserts in his incident report that he administered the pepper spray, at defendant Shaner's instruction, to prevent plaintiff from inflicting further self injury after plaintiff had tied one end of a ligature around his neck and the other end to the top bunk in an attempt to hang himself.  (Doc. 109, Ex. E at 30).

The video evidence conclusively establishes defendant McMackin's version of events.  McMackin's use of pepper spray was not a non-spontaneous use of force in response to plaintiff's allegedly creating a disturbance by yelling into the wing; instead, it was spontaneous force used as an immediate means of controlling an emergency situation – plaintiff's attempt to hang himself.  It was the same force, almost down to the gram, that Sgt. Larson had used to prevent plaintiff's previous act of self harm, force which plaintiff does not challenge as excessive.  *See, e.g., Henry v. Lipford*, No. 5:12cv34/RS/GRJ, 2014 WL 2779588, at *4 (N.D. Fla. June 19, 2014) ("There is little question that if the Plaintiff was attempting to use a noose to harm himself Officer Lipford – consistent with Department rules – was justified in using pepper spray (after giving verbal commands to stop) to prevent Plaintiff from harming

himself." (*citing* FLA. ADMIN. CODE  r. 33-602.210(2)(g)(2011)); *see also* FLA. ADMIN. CODE r. 33-602.210(9)(c) (2014) ("Chemical agents shall only be used when the use of force is authorized and the level of force is necessary to prevent injuries to staff or inmates including any self-injurious behavior exhibited by inmates.").  That McMackin's use of pepper spray aimed to prevent plaintiff's self harm – not to discipline – finds support from the fact that plaintiff did not receive a disciplinary report for the incident because it involved "intentional self injurious behavior." (Doc. 109, Ex. E at 31 (reporting that "Inmate Smith did not receive a Disciplinary Report [i]n accordance with FAC 33-601.303 Reporting Disciplinary Infractions, (4) The commission of acts that should normally result in consideration for formal disciplinary action shall not be subject to such action when these acts are directly associated with an inmate's intentional self injurious behavior.")).

Although averring that "Logically, chemical agents cause swelling in the airways and inhibit breathing so that a person whose airways are already constricted is more likely to suffer asphyxiation," (doc. 153, p. 5), plaintiff does not dispute that McMackin's use of pepper spray to prevent plaintiff from hanging himself was consistent with DOC policy, nor does plaintiff challenge the DOC's policy allowing such spontaneous force.  And none of the summary judgment evidence allows an inference of genuine and serious respiratory damage, much less asphyxiation.  No genuine issue of material fact exists as to whether defendant McMackin used excessive force in violation of the Eighth Amendment when he sprayed plaintiff with pepper spray on February 29, 2012.  Defendant McMackin is entitled to summary judgement on plaintiff's Eighth Amendment claim.

D.   Eighth Amendment Claims Against Defendants Hall, Pugh And Wallace For Use Of Excessive Force During Cell Extraction On February 29, 2012; Failure To Intervene Claim Against Defendant Shaner

Plaintiff claims defendants Hall, Pugh and Wallace used excessive force during the cell extraction after plaintiff hung himself.  (Doc. 23; Doc. 154, Ex. D, Smith Depo. at 67-71).  Defendants argue that the video evidence and the officers' sworn declarations establish that the officers used as little force as necessary to stop plaintiff from hanging himself, to save plaintiff's life, to enforce valid orders which plaintiff was refusing to follow, and to protect themselves from plaintiff's physical resistance to lawful orders.  (Doc. 134, p. 8 ¶ 6 and pp. 10-11).  Defendants argue further that it was necessary for defendant Hall to utilize a shield to cover plaintiff while defendant Shaner cut the ligature (doc. 134, p. 12 n.8; doc. 109, ex. E at 11; Doc. 109, Ex. M, Kolodziej Decl. at ¶ 4); that the muffled sounds of plaintiff resisting and the officers ordering plaintiff to stop resisting while the ligature is being removed is captured on the video evidence; and that plaintiff's continued resistance in response to the officers' orders to submit to restraints is captured on the video evidence.  (Doc. 134, p. 12 n.8).  Plaintiff counters that although he does not challenge the use of an extraction team, this extraction team, unlike the team that released plaintiff from the ligature on August 16, 2011, used excessive and gratuitous force when, after Shaner removed the ligature, plaintiff was placed prone on the floor and was awakening from temporary unconsciousness, defendant Hall jumped in the air and landed a knee on plaintiff's head (or eye), defendant Wallace squeezed plaintiff's testicles, and defendant Pugh aggressively twisted plaintiff's leg.  (Doc. 153, p. 11; Doc. 154, Ex. A, Smith Decl. at ¶ 22).

The video evidence does not conclusively refute plaintiff's allegations.  What occurred inside plaintiff's cell during the cell extraction can be heard, but not seen

with clarity.   (Doc. 109, Ex. B1 at 0:06:20 - 0:07:27).   Crediting in these circumstances, plaintiff's version of events, and drawing reasonable inferences from what *can* be seen and heard on the videotape (for example, what could reasonably be perceived as a severe blow to plaintiff's head causing plaintiff to spontaneously cry out and jerk in pain, Doc. 109, Ex. B1 at 0:06:44-45), genuine issues of fact remain as to the amount of force defendants Hall, Pugh and Wallace used during the cell extraction   and   whether   such   force   was   justified.     The   medical   evidence (memorializing  plaintiff's and the officers' injuries) does not demonstrate that only *de minimis* force was used or that the alleged malicious and gratuitous force (knee strikes to plaintiff's eye, squeezing his testicles and twisting his leg) did not occur as plaintiff claims.   Thus, although plaintiff does not challenge the use of an extraction team, plaintiff does challenge the means employed thereafter.   Several genuine disputes of material fact exist concerning whether, when and to what extent plaintiff resisted the officers' attempts to secure him; the nature of and how much force defendants Hall, Wallace and Pugh used; and whether that force was justified. Defendants Hall, Pugh and Wallace are not entitled to summary judgment on plaintiff's Eighth Amendment claim.

Plaintiff seeks to hold defendant Shaner liable for defendant McMackin's use of pepper spray and for defendants Hall's, Pugh's and Wallace's alleged use of excessive force during the cell extraction, claiming that Shaner failed to intervene in the use of excessive force.   Defendant Shaner claims he is entitled to summary judgment, because the February 29, 2012, use of force was legitimate. (Doc. 134, p. 13).   That is true with regard to defendant McMackin's use of pepper spray. (*See* Discussion Part C *supra*).   Because defendant McMackin's use of pepper spray did not violate the Eighth Amendment, defendant Shaner is entitled to summary judgment

on plaintiff's Eighth Amendment claim associated with that conduct.  In addition, defendant Shaner is entitled to summary judgment on plaintiff's failure to intervene claim arising from the cell extraction team's alleged use of excessive force, because plaintiff admits that defendant Shaner *did* intervene when he saw Hall's alleged knee strike.  (Doc. 154, Ex. A, Smith Decl. ¶ 22 and Ex. D, Smith Depo. at 70:1-4).  No reasonable juror could question the sufficiency of defendant Shaner's response, because even under plaintiff's version of the facts, Hall's knee strikes, Wallace's testicle squeezing and Pugh's leg twisting all happened immediately and simultaneously upon plaintiff regaining consciousness.  (Doc. 23, p. 10 ¶ 20; Doc. 154, Ex. A, Smith Decl. ¶ 22).  Plaintiff admits defendant Shaner was in closest proximity to defendant Hall such that he was able to whisper to Hall (and Hall hear): "Stop it Hall, or you'll kill him."  (*Id*.).  The Eleventh Circuit explained in *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31(11th Cir. 2008):

> "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (*quoting Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002)) (quotation marks omitted).  But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so. *Priester v. City of Rivera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).

*Id*., at 1330-31.  Plaintiff presents no evidence from which a reasonable jury could find that Shaner could have anticipated or prevented Wallace's and Pugh's uses of force when such acts were occurring simultaneously with each other and with the more serious force (Hall's knee strikes) Shaner was attempting to stop.  Because defendant Shaner's inaction with regard to defendants Wallace's and Pugh's alleged uses of excessive force was reasonable and did not violate plaintiff's constitutional

rights, defendant Shaner is entitled to qualified immunity on plaintiff's Eighth Amendment failure to intervene claim arising from the February 29, 2012 use of force.

      E.     Supervisor Liability Claims Against Defendant Kolodziej

     Plaintiff claims defendant Kolodziej violated his rights under the First and Eighth Amendments when Kolodziej ignored plaintiff's reports that B-dormitory staff were threatening him with retaliation.  (Doc. 23, p. 6 ¶ 3).  Specifically, plaintiff alleges that on August 5, 2011, during Kolodziej's rounds, plaintiff personally informed Kolodziej that defendant Gielow told plaintiff "he would make sure [plaintiff] was denied recreation, showers, food, that [plaintiff] was given false Disciplinary Reports (D.R.s), that [plaintiff] would be gassed on a regular basis, and put on strip cell."  (Doc. 154, Ex. A, Smith Decl. ¶ 6; *see also* Doc. 23, p. 6 ¶ 3).  Plaintiff alleges Kolodziej responded by telling plaintiff to stop writing grievances or deal with the consequences.  (Doc. 23, p. 6 ¶ 3).  Plaintiff also complains that defendant Kolodziej denied plaintiff's written grievances seeking an investigation of Gielow's August 16, 2011 use of pepper spray.  (Doc. 23, p. 8 ¶ 11).  Lastly, plaintiff claims that Kolodziej responded to plaintiff's reports of retaliation by G-dormitory staff by informing plaintiff that he would not transfer plaintiff until he suffered the consequences for filing grievances.  (Doc. 23, pp. 8-9 ¶ 15).  Specifically, plaintiff asserts that on  February 23, 2012, during dorm inspection, he personally informed defendant Kolodziej "what was happening to him" in G-dormitory and that Kolodziej responded, "I don't care what they do to you.  I'm not moving you.  You wrote me enough for me to be familiar with your situation, however you must be aware of the consequences for filing grievances on my officers.  Oh, and you keep writing that you're going to kill yourself if my officers don't leave you alone.  I wish that you

would get it over with because it only gets worse form here, I promise." (Doc. 154, Smith Decl. ¶ 18; *see also* Doc. 23, pp. 8-9 ¶ 15).  Kolodziej then allegedly directed defendant McMackin to put plaintiff back on "strip" and to "gas" plaintiff.  (Doc. 23, pp. 8-9 ¶ 15; Doc. 154, Smith Decl. ¶ 19).

Defendant Kolodziej seeks summary judgment on the basis of qualified immunity, arguing that plaintiff cannot establish a supervisor liability claim arising from defendant Gielow's August 16, 2011 use of pepper spray, because:  (1) Kolodziej neither participated in, nor authorized Gielow's action, (2) defendant Gielow's use of force was justified and (3) Kolodziej forwarded three of plaintiff's grievances to the OIG.  (Doc. 134, pp. 15-16 (*citing* Doc. 109, Exs. H, M)).  Defendant Kolodziej states in his affidavit that he "ha[s] never been given information that any officer involved in this lawsuit was a danger to inmate Smith or wanted to harm inmate Smith.  I do not believe that any officer involved in this lawsuit was a danger to inmate Smith or wanted to harm inmate Smith."  (Doc. 109, Ex. M, Kolodziej Decl. ¶ 6).

The summary judgment materials establish that defendant Kolodziej personally received and evaluated two of plaintiff's written grievances (one in December of 2011 and one in February of 2012).  (Doc. 109, Ex. H at 3-6).  Defendant Kolodziej referred plaintiff's December 2011 grievance to the Classification Department "for protective management review", and referred plaintiff's February 2012 grievance to the OIG.  (*Id.*).  In addition, after Gielow's August 16, 2011 administration of pepper spray, defendant Kolodziej directed the preparation of a separate MINS report for the allegations plaintiff made on the video.  (Doc. 109, Ex. D at 26).

Plaintiff cannot establish defendant Kolodziej knew of and disregarded a substantial risk of serious harm arising from plaintiff's confinement in defendant

Gielow's dormitory in August of 2011, because even accepting as true plaintiff's allegations that he personally spoke to defendant Kolodziej on August 5, 2011, plaintiff has not established a causal connection between any act of, or failure to act by, Kolodziej and a violation of the Eighth Amendment.   Gielow's use of pepper spray on August 16, 2011, was not unconstitutional.  (*See* Discussion Part A *supra*). Defendant Kolodziej referred plaintiff's August 16, 2011 verbal allegations of abuse to the OIG.  (Doc. 109, Ex. H, pp. 13-15).  As a matter of law, plaintiff cannot show defendant Kolodziej's alleged deliberate indifference caused plaintiff to receive false and retaliatory disciplinary convictions, because plaintiff was found guilty of the behavioral violations after being afforded due process.  *See O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011).

As to Kolodziej's alleged deliberate indifference to plaintiff's complaints in December of 2011 and February of 2012, the record demonstrates Kolodziej forwarded plaintiff's complaints of retaliation to the classification department for protective management review and to the OIG for investigation.  No reasonable juror could find that this response qualifies as deliberate indifference.  Thus, defendant Kolodziej is entitled to summary judgment on plaintiff's Eighth Amendment claims that Kolodziej was deliberately indifferent to plaintiff's August 2011 complaints of abuse in defendant Gielow's dormitory (B dormitory) and plaintiff's February 2012 complaints of abuse in G dormitory.

Defendants do not address, or seek summary judgment on, plaintiff's claim that defendant Kolodziej violated plaintiff's First Amendment rights on February 23, 2012, when he personally retaliated against plaintiff by directing that plaintiff be placed on "strip" and "gassed" in response to plaintiff's complaints of threats and abuse by G-dormitory staff.  Plaintiff claims Kolodziej's order caused plaintiff to be

placed on "strip" on February 24, 2012.  (Doc. 23, pp. 8-9 ¶¶ 15-16).  Even if defendants did seek summary judgment on this issue, plaintiff's sworn assertions (made in his verified amended complaint and subsequent sworn declaration) of defendant Kolodziej's February 23, 2012, response would be sufficient to raise genuine factual disputes precluding summary judgment on plaintiff's First Amendment retaliation claims against defendant Kolodziej.

F.    First Amendment Retaliation Claims Against Defendants Gielow, Shaner, Hall, Pugh and Wallace

Plaintiff claims defendant Gielow retaliated against him for filing grievances when, upon Gielow's return from training in August of 2011, Gielow continuously threatened and verbally harassed plaintiff that he would be "gassed," given false disciplinary reports, placed on "strip" and denied food, recreation and showers, because plaintiff filed grievances against Gielow during an earlier period of incarceration at Santa Rosa CI in 2010.[8]  Plaintiff asserts that defendant Gielow's retaliatory threats and verbal harassment caused him to engage in his acts of self harm.   Defendants do not address, or seek summary judgment on, plaintiff's retaliatory threat/verbal harassment claim against defendant Gielow, but merely address Gielow's use of pepper spray.  (Doc. 134, pp. 17-19).  Thus, this claim survives summary judgment.

Plaintiff also claims defendant Shaner threatened and verbally harassed him for filing grievances, in violation of the First Amendment.  Plaintiff alleges that on February 28, 2012, while plaintiff was still on "strip," defendant Shaner threatened to pepper spray plaintiff in retaliation for plaintiff's filing grievances and, after plaintiff

---

8  To the extent plaintiff challenges as retaliatory defendant Gielow's use of pepper spray on August 16, 2011, his claim is precluded by the video evidence establishing that Gielow's use of pepper spray was a non-retaliatory, necessary response to plaintiff's disruptive behavior.

declared a psychological emergency and was removed from "strip" due to his threats of self harm, Shaner returned the next day (February 29, 2012) and again threatened plaintiff (giving plaintiff the choice between being pepper sprayed and being put back on "strip"). (Doc. 23, p. 9 ¶ 17). Plaintiff states he was not doing anything to warrant the threatened discipline at the time Shaner made his threats, (doc. 154, Ex. D. Smith Dep. at 63:10-15), and that the threats and verbal harassment were in retaliation for plaintiff's filing grievances. (Doc. 154, Ex, D, Smith Dep. at 62:8-25 and 63:1-24). When defendant Shaner returned on February 29, 2012, with the hand-held camera operator and began "staging" the scene for his retaliatory use of force, plaintiff hung himself. (Doc. 23, pp. 9-10 ¶¶ 18-19). Defendants' motion for summary judgment does not address plaintiff's claim of Shaner's retaliatory threats and verbal harassment. Thus, this claim necessarily survives summary judgment.[9]

Plaintiff claims defendants Hall, Pugh and Wallace's use of excessive force during the February 29, 2012 cell extraction was in retaliation for plaintiff's filing grievances. The only specific allegation plaintiff offers to support this claim is that defendant Hall stated on February 28, 2012, "It's finally your turn to learn, Smith." (Doc. 154, Ex. A, Smith Decl. at ¶ 20). Although this is sufficient to raise a genuine issue of fact for trial as to whether Hall's alleged use of excessive force was retaliatory, it is insufficient to raise a reasonable inference that Pugh's or Wallace's alleged use of excessive force was retaliatory. Plaintiff has not established a causal connection between his grievances and Pugh's alleged testicle squeezing or Wallace's alleged leg twisting during the February 29, 2012 cell extraction. Thus, although

---

9 To the extent plaintiff challenges as retaliatory defendant Shaner's spontaneous February 29, 2012 order to defendant McMackin to use pepper spray to deter plaintiff's acts of self harm, plaintiff's claim is foreclosed by the video evidence establishing that McMackin's spontaneous use of pepper spray was a justified and necessary response to plaintiff's acts of self harm.

plaintiff's First Amendment claim against defendant Hall survives summary judgment, his First Amendment claims against defendants Pugh and Wallace do not.

As a final note, to the extent plaintiff claims the disciplinary convictions he received in August of 2011 and February of 2012 were fabricated in retaliation for filing grievances, such claims are not actionable, because plaintiff was found guilty of the disciplinary charges, evidence supported the findings of guilt, and plaintiff was afforded adequate due process in the disciplinary proceedings. *O'Bryant v. Finch*, 637 F.3d at 1215 (holding that "If a prisoner is found guilty of an actual disciplinary infraction after being afforded due process *and* there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report.").

G.   Plaintiff's Claims For Compensatory and Punitive Damages

Plaintiff seeks compensatory and punitive damages for defendants' alleged violation of his constitutional rights.  The Prison Litigation Reform Act ("PLRA") provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  "[T]he phrase 'Federal civil action' means all federal claims, including constitutional claims."  *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir. 2002).  Although § 1997e(e) does not define physical injury, the Eleventh Circuit has concluded that, to satisfy the statute, "the physical injury must be more than *de minimis*, but need not be significant."  *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated, in part, on other grounds*, 216 F.3d 970 (11th Cir. 2000) (en banc) (concluding that a "dry shave" was not the kind of physical injury cognizable under § 1997e(e)); *see also e.g., Quinlan v. Pers. Transp. Servs Co.*, 329 F. App'x 246, 249 (11th Cir. June

5, 2009) (concluding that temporary chest pain, headache, difficulty breathing and periodic episodes of back pain, none of which required immediate medical attention or evidenced physical injury besides discomfort, did not surmount § 1997e(e)'s bar).

This action, brought by plaintiff under 42 U.S.C. § 1983, is a "Federal civil action" for purposes of § 1997e(e).  It is undisputed that plaintiff was a prisoner at the time he filed this action, and that the harm of which plaintiff complains occurred while plaintiff was in custody.  The claims surviving summary judgment are: plaintiff's First Amendment claim for defendant Barnes' alleged retaliatory fabrication of the February 4, 2012, incident involving plaintiff's property; plaintiff's Eighth Amendment claims against defendants Hall, Pugh and Wallace for their use of excessive force – through the means described above – during the February 29, 2012, cell extraction; plaintiff's First Amendment claim against defendant Kolodziej for retaliatory discipline; plaintiff's First Amendment claims against defendants Gielow and Shaner for their retaliatory threats and verbal harassment; and plaintiff's First Amendment claim against defendant Hall for his retaliatory use of excessive force.

The only physical injury plaintiff alleges as a result of these surviving claimed constitutional violations are injury to his eye (which was temporary and minor as established by the medical evidence) and a vague "soft tissue injury" to his leg (which plaintiff does not support with any medical evidence).  As plaintiff has not presented evidence raising a genuine issue of fact for trial as to whether he suffered more than a *de minimis* physical injury as a result of defendants' conduct, he cannot recover compensatory or punitive damages on any claim.

Accordingly, it is respectfully RECOMMENDED:

1.  That defendants' renewed motion for summary judgment (doc. 134) be GRANTED IN PART and DENIED IN PART as follows:

      a.    That summary judgment be GRANTED in favor of defendant Gielow, on the basis of qualified immunity, on plaintiff's claim that Gielow violated the Eighth Amendment when he sprayed plaintiff with pepper spray on August 16, 2011.

      b.    That summary judgment be DENIED to defendant Barnes on plaintiff's claim that Barnes violated the First Amendment when he retaliated against plaintiff for filing grievances by fabricating the February 4, 2012 incident report that led to plaintiff's placement on property restriction.

      c.    That summary judgment be GRANTED in favor of defendant Barnes, on the basis of qualified immunity, on plaintiff's claim that Barnes violated the Eighth Amendment when he fabricated the February 4, 2012 incident report that led to plaintiff's placement on property restriction.

      d.    That summary judgment be GRANTED in favor of defendant McMackin, on the basis of qualified immunity, on plaintiff's claim that McMackin violated the Eighth Amendment when he sprayed plaintiff with pepper spray on February 29, 2012.

      e.    That summary judgment be DENIED to defendants Hall, Pugh and Wallace on plaintiff's claim that these defendants violated the Eighth Amendment when they used excessive force on plaintiff during the February 29, 2012 cell extraction.

      f.    That summary judgment be GRANTED in favor of defendant Shaner, on the basis of qualified immunity, on plaintiff's claim that Shaner violated the Eighth Amendment when he failed to intervene in the February 29, 2012 use of force.

g.    That summary judgment be GRANTED in favor of defendant Kolodziej, on the basis of qualified immunity, on plaintiff's Eighth Amendment claims that Kolodziej was deliberately indifferent to plaintiff's August 2011 complaints of abuse in defendant Gielow's dormitory (B dormitory) and plaintiff's February 2012 complaints of abuse in G dormitory.

h.    That summary judgment be DENIED to defendants Gielow, Kolodziej, Shaner and Hall on plaintiff's claims that these defendants violated the First Amendment when Gielow and Shaner threatened plaintiff with unjustified discipline and verbally harassed plaintiff in retaliation for plaintiff's filing grievances, when Kolodziej directed that plaintiff be disciplined in retaliation for plaintiff's February 23, 2012 verbal complaint, and when Hall used excessive force during the February 29, 2012 cell extraction.

i.    That summary judgment be GRANTED to defendants Pugh and Wallace on plaintiff First Amendment retaliation claims.

j.    That summary judgment be GRANTED to all defendants on plaintiff's compensatory and punitive damages claims on the grounds that such claims are barred by 42 U.S.C. § 1997e(e).

2.    That this matter be referred to the undersigned for further pretrial proceedings on those individual capacity claims for nominal damages surviving summary judgment.

At Pensacola, Florida this 7th day of November, 2014.

*/s/ Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).